**CITY OF GRAPEVINE, TEXAS,
et al., Petitioners,**

**v.**

**DEPARTMENT OF TRANSPORTATION,
et al., Respondents.**

**Dallas/Fort Worth International
Airport Board, Intervenor.**

No. 92–1151.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 1, 1993.

Decided March 18, 1994.

Rehearing Denied May 9, 1994.

Eliot R. Cutler, argued the cause for petitioners. With him on the briefs was Perry M. Rosen. Peter J. Kirsch, Robert H. Power, and Christopher Caso entered an appearance for petitioners in No. 92–1151. Peter J. Kirsch and James W. Deatherage entered an appearance for petitioner in No. 92–1158. John Longstreth entered an appearance for petitioners in No. 92–1247.

Albert M. Ferlo, Jr., Attorney, United States Department of Justice, argued the cause for respondents. With him on the brief was Peter R. Steenland, Jr., Acting Deputy Assistant Attorney General, United States Department of Justice.

Michael Schneiderman argued the cause for intervenor Dallas/Fort Worth International Airport Board. With him on the brief were Kevin E. Cox and Michael M. Conway.

On the brief for amici curiae The Church in Dallas, The Church in Irving, and the Living Stream Ministry was Rangely Wallace.

On the brief for amicus curiae Natural Resources Defense Council was S. Jacob Scherr.

On the brief for amicus curiae National Trust for Historic Preservation in the United States was Elizabeth S. Merritt. Paul W. Edmondson and Andrea C. Ferster entered an appearance.

Before MIKVA, Chief Judge, BUCKLEY, and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Various individuals and political subdivisions of the State of Texas petition for review of the Federal Aviation Administration's decision approving a plan to expand the Dallas/Fort Worth International Airport and declaring portions of the expansion project eligible for federal funding. The petitioners contend that: (1) the FAA's categorical exclusion of some elements of the expansion project from consideration in its Final Environmental Impact Statement (FEIS) renders that document inadequate under the FAA's regulations implementing the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; (2) the FAA failed to consider the environmental impact of all reasonable and feasible alternatives to the project, in violation of Council on Environmental Quality (CEQ) regulations implementing the NEPA; (3) the FAA erred in determining that the airport project would not "use" historic properties within the meaning of § 4(f) of the Department of Transportation (DOT) Act, 49 U.S.C. § 303(c); and (4) the FAA violated the National Historic Preservation Act (NHPA), 16 U.S.C. § 470 *et seq.*, by issuing its Record of Decision before review under the NHPA was complete. For the reasons set forth below, we deny the petitions for review in all respects.

## I. Background

In 1988, the DFW Airport Board proposed to expand the airport and asked the FAA to fund eligible portions of the project. The Board's proposed Airport Layout Plan (ALP) contemplated the addition of two runways, two terminals, and more than 400 acres of parking, as well as cargo, hangar, maintenance, and other support facilities. Existing runways would also be expanded, while some terminals would be razed.

Under the NEPA, the FAA was required as part of its approval process to assess the environmental effects of the project. 42 U.S.C. § 4332(2)(C). Accordingly, in August 1990 the agency solicited comments on a Draft EIS (DEIS), and later (in January 1992) released the FEIS. Still later, the FAA gave "final approval" to the ALP and declared the project eligible for federal funding. *See* FAA Record of Decision, April 1992. The FAA specifically provided, however, that no expenditures for construction of the West Runway would be permitted until the review process required by the NHPA was completed. Three cities and a school district in which the airport is located, and certain owners of undeveloped property in the area, now seek review of the FEIS and of the FAA's Decision, pursuant to 49 U.S.C. § 1486.

## II. Analysis

The petitioners raise various challenges under the FAA's regulations, CEQ regulations, the DOT Act, and the NHPA.

### A. *Exclusions from the FEIS*

The NEPA requires each federal agency to consider in an EIS the environmental impact of "every recommendation or report on proposals for ... major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must include, among other things, a "detailed statement" describing the reasonably foreseeable environmental impact both of the proposed federal action and of any feasible alternative(s) to the proposed federal action, including non-action. 42 U.S.C. §§ 4332(2)(C)(i), (iii). Upon review of the EIS, our job is to ensure that the

agency took a "hard look" at the environmental consequences of its decision to go forward with the project. *Natural Resources Defense Council, Inc. v. Hodel*, 865 F.2d 288, 294 (D.C.Cir.1988).

The petitioners contend that the FEIS fails the "hard look" test. The gravamen of their argument is that the FAA improperly excluded substantial portions of the ALP from its environmental review, thereby failing to consider the full environmental impact of the project as required under the FAA's regulations governing the proper scope of an EIS.

The FAA described the "proposed federal action" for which it prepared the FEIS as "the Federal approval and funding participation in the construction of proposed new Runway 16/34 East, scheduled to be operational in 1992, and proposed new Runway 16/34 West, scheduled to be operational in 1997, and the runway-related improvements and safety actions associated with their operation at the [DFW] Airport." The FAA determined that certain elements of the project, such as ground transportation improvements, could be categorically excluded from individualized consideration in the FEIS.

In Appendix 3 of the FEIS the FAA explained that it categorically excluded those aspects of the project under FAA Order 5050.4A ¶ 23. That regulation implements a CEQ rule, 40 C.F.R. § 1508.4, that authorizes an agency to list in advance the types of federal actions within its jurisdiction for which an Environmental Assessment (EA) or an EIS normally will not be required. The petitioners do not deny that the elements that the FAA excluded in this instance are all listed in ¶ 23; rather they claim that the FAA was required to examine their effects anyway pursuant either to ¶ 24, which enumerates various characteristics that preclude exclusion under ¶ 23, or pursuant to ¶ 26, which requires consideration of "the overall cumulative impact of the proposed action and the consequences of subsequent related actions."

1. Exceptional Circumstances Under 5050.4A ¶ 24

Paragraph 24 provides that "[p]roposed Federal actions which are normally categorically excluded but which have any of the following characteristics shall be the subject of an environmental assessment ...

a. An action that is likely to have an effect on properties protected under section 106 of the Historic Preservation Act of 1966 ... or use section 4(f) lands....

b. An action that is likely to be highly controversial on environmental grounds. A proposed Federal action is considered highly controversial when the action is opposed on environmental grounds by a Federal, state, or local government agency or a substantial number of the persons affected by such action....

c. An action that is likely to have a significant impact on natural, ecological, cultural, or scenic resources of national, state, or local significance....

d. An action that is likely to be highly controversial with respect to the availability of adequate relocation housing....

e. An action that is likely to ... cause substantial division or disruption of an established community, or disrupt orderly, planned development or ... increase surface traffic congestion....

f. An action that is likely to ... have a significant impact on noise levels of noise sensitive areas; [h]ave a significant impact on air or water quality or violate the local, state, or Federal standards for air quality; [or h]ave a significant impact on water quality or contaminate a public water system; or ... [b]e inconsistent with any Federal, state, or local law or administrative determination relating to the environment.

g. Other action that is likely to directly or indirectly affect human beings by creating a significant impact on the environment."

The petitioners do not claim that each excluded element, standing alone, satisfies a ¶ 24 criterion; rather, they argue more broadly that "*[t]he Expansion Project* met not just one, but most of the criteria set forth in paragraph 24." (Emphasis added.) For example, invoking ¶ 24(b) they point out that each of the petitioners opposed the airport expansion project, and that each of the petitioners as well as the Attorney General of

Texas, the DOT, and the Environmental Protection Agency (EPA) submitted comments questioning the adequacy of the FAA's environmental review of the project. Presumably with ¶ 24(e) in mind, they contend that the proposed ALP would disrupt community planning that had been carried out in reliance upon an airport master plan devised in the 1970's. "In short," they say, "even the FAA's own regulations obliged it to review the entire expansion project, including all the portions it ignored as categorically excluded."

The FAA, on the other hand, maintains that the petitioners improperly aggregate the excluded elements into an "action" precluded by ¶ 24 from exclusion. According to the agency, an element that is otherwise excluded pursuant to ¶ 23—a new terminal, or the expansion of a runway, for example—is not excludable only if that element by itself meets one of the criteria of ¶ 24.

The FAA's reading of its own regulation is not unreasonable. By its terms ¶ 24 applies to "[p]roposed federal actions which are normally categorically excluded" pursuant to ¶ 23; under ¶ 23 the FAA categorically excluded from the FEIS only particular elements of the ALP. Therefore, when ¶ 24 precludes the exclusion of, for example, "[an] action that is likely to be highly controversial on environmental grounds," it refers to a specific action listed in ¶ 23 as eligible for categorical exclusion, not to the larger project of which it is but a small piece.

The petitioners' attempt to invoke the requirements of ¶ 24 because "[t]he Expansion Project" as a whole meets the criteria of that paragraph is contrary to the whole tenor of Order 5050.4A, which addresses the requirements for separately evaluating the environmental impact of particular elements. *See, e.g.,* ¶ 22a(5) (requiring an EA for "construction ... of entrance or service road connections which adversely affect the capacity of such roads"; ¶ 23a(4) (excluding from environmental review "construction or expansion of passenger handling facilities"). For any project the environmental effects of which are significant enough to require an EIS in the first place, the petitioners' approach would negate altogether the possibility of excluding any individual element under ¶ 23.

This consequence of the petitioners' interpretation only highlights the reasonableness of the FAA's interpretation of its regulation.

2. Cumulative Impact Under 5050.4A ¶ 26

Paragraph 26 of the same regulation provides generally that "[i]n determining whether an environmental impact statement is required for a proposed Federal action, it is necessary to consider the overall cumulative impact of the proposed action and consequences of subsequent related actions." The petitioners contend that the FAA granted unconditional approval to every element of the expansion project but avoided considering the cumulative impact of many of the individual elements of the project by labelling them "independent" or "speculative." The FAA points out that it did consider the environmental impact of some elements that it deemed independent or speculative when it considered the cumulative impact of categorically excluded elements of the project pursuant to ¶ 26. In any event the FAA maintains that, although it approved the ALP unconditionally, "the ability of DFW and the FAA to actually implement many of the features shown on that document is in fact conditioned on further review and analysis by the FAA," implying that any environmental impact slighted in the FEIS will be the subject of further consideration.

At several points in the FEIS, the FAA did indeed consider the cumulative impacts of categorically excluded elements of the expansion project—upon land use, air quality, endangered and threatened species, and wetlands. The petitioners raise no challenge to the adequacy of the FAA's treatment of the cumulative impact of those excluded projects; nor do they challenge the FAA's conclusion that the cumulative impact of the excluded projects was not significant.

Our review of the FEIS suggests that the FAA considered the cumulative impact of all of the "independent" and of most if not all of the "speculative" elements that the petitioners complain were improperly excluded from consideration in the FEIS. We note, however, that certain elements that the EPA claimed in its comments on the DEIS were improperly excluded—for example, demolition of existing terminals and of a hotel—do

not appear at those places in the FEIS to which the FAA points in order to show that it considered otherwise excluded elements when it assessed the cumulative impact of the project. Unless the FAA considered those elements elsewhere in the FEIS, they can not be deemed part of the approved ALP insofar as the FAA's duties under the NEPA are concerned. In other words, if the FAA determined that review of an element of the ALP would have been premature when it was considering the cumulative impact of the project in the FEIS, then such review must be done when the matter is no longer too speculative to warrant it.

B. *Consideration of Alternatives*

■ According to the CEQ, the "heart" of an EIS should be the agency's presentation of "the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 CFR § 1502.14. The range of alternatives that the agency must consider is not infinite, of course, but it does include all "feasible" or "reasonable" alternatives to the proposed action. 40 CFR §§ 1502.14(a)–(c), 1508.25(b)(2). This "rule of reason governs 'both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them.'" *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 195 (D.C.Cir.1991) (emphases in original).

The petitioners argue that the FAA improperly curtailed its consideration of alternatives by the way in which it stated the purpose of the airport expansion project. In the DEIS, the FAA said that the purpose of the project was to meet increased demand at the DFW Airport; thus it considered only alternative runway configurations at the airport itself. In their comments on the DEIS, the EPA, the DOT. and the Attorney General of Texas criticized the FAA for failing to consider alternatives off the DFW Airport site. In the FEIS, the FAA described the purposes of the project to include economic development of the Dallas/Fort Worth area and meeting national and international demand for a hub airport. It briefly considered and rejected off-site alternatives to the expansion plan, including construction of a new regional airport and construction of a "wayport" facility designed to handle only connecting traffic. The agency concluded that neither a new airport nor a wayport could be completed in time to alleviate problems at the DFW Airport, and that a wayport, which is as yet an unproven concept, could also be detrimental to the level of nonstop and international service to the DFW Airport. As the only "viable alternatives" to the proposed plan, therefore, the different possible runway configurations were addressed in more detail.

First, the petitioners (and some of the amici) argue that it was improper for the FAA, in defining the purpose of the project, to consider the economic goals of the project's sponsor, the DFW Airport Board. This argument is foreclosed, however, by our decision in *Citizens Against Burlington:* Per then-Judge Thomas, where a federal agency is not the sponsor of a project, "the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project." 938 F.2d at 197–98. In formulating the EIS requirement, the "Congress did not expect agencies to determine for the applicant what the goals of the applicant's proposal should be." *Id.* at 199. While it is not clear whether federal funds were committed to the project in *Citizens Against Burlington,* we see no basis for holding that where, as here, federal funds would be involved—assuming the project passes environmental muster—the agency may not consider the sponsor's goals to the same extent. Therefore, we conclude that the FAA's statement of the purpose of the airport expansion project did not improperly constrain its consideration of alternatives in the FEIS.

Second, the petitioners contend that the FAA, in response to criticism of the scope of the alternatives it considered in the DEIS, merely "manipulate[d] the statements of need and purpose to avoid considering any alternatives except for those that achieve what has been the FAA's unmistakable goal from day one—the expansion of DFW Airport." We pass over the facile implication

that the FAA harbored an improper motive for changing the statement of purpose in the FEIS. The very purpose of a DEIS is to elicit suggestions for change. The resulting FEIS must be evaluated for what it is, not for why the drafter may have made it so. Here the record shows that the FAA gave reasoned consideration to off-site alternatives to the proposed project. Therefore, we can not hold that the FAA failed to take a "hard look" at the environmental impact of the alternatives to the project. *Hodel,* 865 F.2d at 294.

## C. *Noise Measurement Methodology*

■ Section 4(f) of the DOT Act, 49 U.S.C. § 303 (1983), makes it "the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." Accordingly, § 303(c) provides:

> The Secretary [of Transportation] may approve a transportation program or project requiring the use ... of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance ... only if—
>
> (1) there is no prudent and feasible alternative to using that land; and
>
> (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

For the purpose of § 4(f), noise that is inconsistent with a parcel of land's continuing to serve its recreational, refuge, or historical purpose is a "use" of that land. *Allison v. United States DOT,* 908 F.2d 1024, 1028 (D.C.Cir.1990).

The FAA, applying its standard "Part 150" noise measurement technique, as set forth at Appendix A to 14 C.F.R. § 150, found that the protected areas—viz., parks and historic sites—potentially affected by the DFW Airport expansion would not be "used" within the meaning of § 4(f). The Part 150 guidelines rely upon weighted average day and night sound level measurements (so-called Ldn) "for the analysis and characterization of multiple aircraft noise events and for determining the cumulative exposure of individuals to noise around airports." 14 C.F.R. Pt. 150, App. A. § A150.3(b). The guidelines provide that a recreational area is "used" by noise at a level of 70 to 75 Ldn. There is no guideline specifically for historic sites in Part 150. As it turns out, however, all the historic sites at issue in this case are in fact residential properties, and the FAA therefore used the guideline for residences, which is 65 Ldn. *Id.* at App. A Table 1.

The petitioners argue that use of the Part 150 guidelines is inappropriate because they were not designed for the purpose of § 4(f) but in connection with other types of land use and funding decisions. They also contend that it was arbitrary and capricious for the FAA not to rely upon indicators measuring the intensity of single noise events, or upon "a computer simulation technique" that "replicate[s] the aircraft noise that people actually will hear."

As set forth in its Decision, the FAA takes the position that the Ldn system is the "best measure of noise exposure to identify significant impact on the quality of the human environment and is the only noise metric with a substantial body of scientific data on the reactions of people to noise." This court has previously deferred to the agency's expertise in choosing the appropriate way to measure noise; indeed we have specifically approved the FAA's use of the Ldn metric. *See Sierra Club v. DOT,* 753 F.2d 120, 128 (D.C.Cir.1985); *Citizens Against Burlington,* 938 F.2d at 201. The petitioners offer no distinction upon which we could withhold our approval in this case.

Furthermore, we note that in 1990 the EPA and the FAA undertook a joint study of noise measurement methodology, and that pending the completion of their study the FAA agreed to include a single event noise analysis in its assessment of impacts at a number of airport projects, including the DFW Airport expansion project. Accordingly, although the FAA's noise analysis in this case "was primarily based upon the development of Ldn contours," in considering the

environmental effect of noise caused by the expansion project the agency also "estimat[ed] levels of annoyance, conduct[ed] a time-above threshold analysis, determin[ed] single-event noise levels and evaluat[ed] the potential noise impacts of airspace actions occurring at altitudes of up to 18,000 feet above ground level." In view of our prior decisions, and of the FAA's ongoing cooperation with the EPA to study different methods of evaluating noise pollution, the agency's "primary reliance" upon the Ldn metric in this case was surely neither arbitrary nor capricious.

The petitioners also challenge the FAA's application to historic sites of the Part 150 standard for "residential properties." As they point out, we have previously noted that "while it is reasonable for the agency to rely on guidelines in determining whether a 'use' of section 4(f) lands has occurred, [the standard used] must bear some relevance to the value, significance, and enjoyment of the lands at issue." *Allison v. DOT,* 908 F.2d at 1029. In that case we held that the DOT could not apply the standard for "recreational parks," which include amusement parks and recreational waters, to determine whether airport noise would constructively use a wildlife preserve, the purpose of which is to provide "tranquility and the opportunity to observe nature undisturbed by human activity." *Id.*

In this case the historic sites at issue are in daily use as "residential properties." There might well be instances in which the 65 Ldn standard for residential properties would be inadequate to protect the particular values that led to the designation of a site as historic. Consider, for example, a village preserved specifically in order to convey the atmosphere of rural life in an earlier (and presumably a quieter) century. *Cf. Communities, Inc. v. Busey,* 956 F.2d 619, 624 (6th Cir.1992) (suggesting no § 4(f) use because "noise would not affect the relevant characteristics of [an historic neighborhood]—its architecture and its place in history"). There is no reason, however, to believe that the use standard applicable to a private home is inapposite merely because the home is historic. Therefore, we uphold in all respects the noise

measurement methodology that the FAA used in this case.

D. *Conditional Approval of the West Runway*

■ The petitioners and the National Trust for Historic Preservation, amicus, argue that the FAA unlawfully approved the proposed West Runway before completion of the review process required by the NHPA, 16 U.S.C. §§ 470–470w–6. That Act requires each federal agency to take responsibility for the impact that its activities may have upon historic resources, and establishes the Advisory Council on Historic Preservation (ACHP) to administer the Act. Section 470f (Title I, Section 106) requires that:

> The head of any Federal agency ... shall, prior to the approval of the expenditure of any Federal funds on the undertaking ... take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]. The head of any such Federal agency shall afford the [ACHP] ... a reasonable opportunity to comment with regard to such undertaking.

Under the regulations of the ACHP, the federal agency must, in consultation with the relevant State Historic Preservation Officer, identify the project's "area of potential effect," locate all historic properties in that area, and assess the actual effect of the project upon those specific properties. 36 C.F.R. §§ 800.4(b), 800.4(c), 800.5. If the agency determines that the project will have no adverse effect upon any historic property, then the ACHP may either agree with such a finding or object and propose changes. If the agency does not accept the ACHP's changes, then the ACHP will itself enter a finding of adverse effect. *Id.* at § 800.-5(d)(2). The agency, the ACHP, and the State Historic Preservation Officer are then to consult in order to "seek ways to avoid or reduce" the adverse effect. § 800.5(e).

In its Decision the FAA conditioned final approval of the West Runway upon its subsequent reevaluation, pursuant to Order 5050.-4A, of the runway's impact; the agency specifically noted that as part of that reevaluation it would "take into account the conclu-

sions and recommendations arising out of the consultation process required by Section 106" of the NHPA. Seven months later (in November 1992) the FAA transmitted to the Texas Historical Commission its final assessment of the effects of the West Runway. After a further six-month period of deliberation the FAA, the Texas Historical Commission, and the DFW Airport Board entered into an agreement finding that there would be no adverse effect within the meaning of the NHPA, and submitted that finding to the ACHP. The ACHP then informed the FAA that it disagreed with the finding and that it wished to consult with the FAA about alternatives and mitigation measures.

Throughout these events the FAA followed the procedure prescribed by the ACHP's regulations. Much of the relevant activity, however, took place after the FAA had issued its Decision. Although it is of course desirable for the § 106 process to occur as early as possible in a project's planning stage, we do not agree with the petitioners that in this case the FAA's conditional approval of the West Runway violated any requirement of the NHPA. Merely by issuing its Decision the FAA did not "approv[e] the expenditure of any Federal funds" for the runway. Recall that the FAA is not the sponsor of the airport project; if the DFW Airport Board commits its own resources to the West Runway—for further planning, engineering, or what have you short of construction—although the runway was only conditionally approved, then it does so at the risk of losing its investment should the § 106 process later turn up a significant adverse effect and the FAA withdraw its approval. In sum, because the FAA's approval of the West Runway was expressly conditioned upon completion of the § 106 process, we find here no violation of the NHPA.

### III. Conclusion

The scope of the FEIS and of the alternatives that the FAA considers therein demonstrate that the agency took a "hard look" at the DFW Airport expansion project and fully complied with its own and the CEQ's regulations implementing the NEPA. The FAA's primary reliance upon its established Ldn

noise measurement methodology for the purpose of determining whether the project would "use" any historic property within the meaning of § 4(f) of the DOT Act was not arbitrary or capricious. Nor do we find a violation of the NHPA in the FAA's conditional approval of the West Runway pending completion of the consultations required by § 106 of that Act. For these reasons, the petitions for review are

*Denied.*