**CORRIDOR H ALTERNATIVES, INC., et al., Plaintiffs,**

v.

**Rodney SLATER, Secretary, U.S. Department of Transportation, et al., Defendants.**

**Civ. No. 96–2622 (TFH).**

United States District Court, District of Columbia.

Oct. 8, 1997.

Andrea Ferster, Washington, DC, for Plaintiffs.

Stephanie M. Parent, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, DC, for Defendants.

Sheila Deborah Jones, Cutler & Stanfield, Washington, DC, for Fred Vankirk, Secretary, State Highway Engineer.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Pending before the Court are the parties' cross motions for summary judgment. The Court has received a voluminous administrative record and extensive briefing from the parties on these issues; the Court has also received briefs from a group of amici curiae. The Court held a hearing on these motions on September 10, 1997. After considering the arguments at the hearing and the submissions of the parties and of amici, the Court will deny plaintiffs' motion for summary judgment and will grant defendants' motion for summary judgment.

### I. Statutory Overview and Factual Background

This case involves the Corridor H project, which is part of the Appalachian Highway Development System. Congress authorized the AHDS to provide highway access to the region in order to "open up an area or areas where commerce and communication have been inhibited by lack of adequate access." 40 U.S.C. app. § 201(a). The highway for the Corridor H project was originally scheduled to stretch from Interstate 79, near Weston, WV, to Interstate 81, near Strasburg, VA; the project has since shortened, and would now stop at the West Virginia–Virginia border.

Federally-funded highway projects such as the Corridor H project must comply with the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–4347. The statute does not mandate substantive choices or decisions, but it sets forth procedural requirements for the decision-making process. The statute requires that an Environmental Impact Statement (EIS) be prepared for any "major Federal action significantly affecting the quality of the environment." 42 U.S.C. § 4332; 40 C.F.R. Part 1501. The statute prescribes the content of the EIS; among other things, it must include a "detailed statement" that discusses (1) the environmental impact of the proposed action, (2) adverse environmental effects that cannot be avoided, and (3) alternatives to the proposed action. 42 U.S.C. § 4332(2)(C). Where an EIS is required, the agency must also prepare a Record of Decision (ROD) that sets forth the chosen action and the analysis behind that decision.[1] 40 C.F.R. § 1502.2

The Council on Environmental Quality has established the procedures for preparing and promulgating an EIS. Among other requirements, a draft EIS must be prepared and

---

1. The ROD must be issued no sooner than 30 days after notice of the FEIS has been published in the Federal Register. 23 C.F.R. § 771.127.

circulated for comment, and the Final EIS (FEIS) must reflect that consideration was given to the comments. 23 C.F.R. §§ 771.123, 771.125. The FEIS also must document compliance, to the extent possible, with all applicable environmental statutes and executive orders. *Id.*

When new information or changes in the proposed action create significant environmental impacts that were not evaluated in the FEIS, the agencies must issue a Supplemental EIS (SEIS) to discuss the new impacts. 23 C.F.R. § 771.130(a). However, an SEIS is not necessary where changes do not result in significant impacts or where there are no new impacts not already considered in the FEIS. 23 C.F.R. § 771.130(a),(b).

In addition to obligations under NEPA, federal highway projects often have obligations under Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303. That statute affects projects that require the "use of publicly owned land . . . of an historic national, State, or Local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site)." 49 U.S.C. § 303. By statute, such projects may be approved *only* if (1) there is no prudent and feasible alternative and (2) all possible planning has been taken to minimize harm to the protected land. *Id.* However, unlike NEPA, which applies to all federal highway projects, this statute is triggered only if a project uses protected lands.[2] If no such protected lands are used by the project, then no Section 4(f) duties are implicated.

The story of the Corridor H project and NEPA compliance is fairly complex. Study and planning for the project began in the late 1970's and the agencies involved produced a Draft Environmental Impact Statement (DEIS) in 1981. Shortly thereafter, the project was suspended. The project remained suspended until 1990, when defendants Federal Highway Administration (FHWA) and West Virginia Department of Transportation (WVDOT) began collaboration on a Supple-

mental Draft EIS (SDEIS) to account for new studies, changes in alternatives, and other effects of passing years. They prepared the SDEIS in two stages: first, a Corridor Selection draft (CSDEIS), and second, an Alignment Selection draft (ASDEIS). The CSDEIS, issued in 1992, examines potential corridors (2000 feet wide sections) for improvement or for a new highway. The ASDEIS, issued in 1994, examines some alternative plans for the project, including the four-lane Build Alternative, the two-lane Improved Roadway Alternative, and the No Action Alternative.

FHWA issued an FEIS in April 1996. The FEIS identifies defendants' choice of the four-lane Build Alternative as the Preferred Alternative, with a corridor that stretches over 100 miles from Elkins, WV to the West Virginia–Virginia border. The Preferred Alternative provides for the construction of new, four-lane highway segments for much of the length of the project. The FEIS includes two agreements that govern post-FEIS implementation of the program. First, the FEIS includes a Programmatic Agreement, which establishes a procedure for compliance with Section 106 of the National Historic Preservation Act. Second, the FEIS includes a Migration Agreement to deal with potential migration of the corridor placement prior to final FHWA approval of the project. According to defendants, these agreements are intended to ensure compliance with Section 4(f) of the Department of Transportation Act. In order to guarantee this compliance, the ROD—issued August 2, 1996—conditioned final approval of the project on fulfillment of these agreements. This arrangement essentially recognizes that compliance with Section 4(f) has not yet been achieved, but it makes final approval of the project plans conditional on that compliance.

Plaintiffs' Complaint raises four alleged defects with defendants' decision to support the four-lane Build Alternative as the Preferred Alternative. First, in Count One, plaintiffs argue that defendants have violated

---

**2.** The lands relevant to this case are parks and wildlife preserves—which must be publically owned—and historic sites, which can be public or private. The historic sites are protected under

Section 4(f) if they are on or are eligible for the National Register of Historic Places. 23 C.F.R. § 771.135.

the procedural requirements of NEPA by failing to consider a two-lane, improved roadway alternative in either the FEIS or ROD. Second, in Count Three,[3] they argue that modifications in the alignment of the corridor since the FEIS was issued mandate the preparation of an SEIS, which defendants have declined to do. Third, in Count Four, plaintiffs allege that defendants must document compliance with Section 4(f) of the DOTA in either the FEIS or ROD, and that defendants cannot escape this requirement by making final acceptance of the project conditional on eventual compliance. Finally, in Count Five plaintiffs allege that the project, as planned, will improperly use Section 4(f) sites in violation of the law.

## II. Standards of Review

NEPA directs the agency only to take a hard look at environmental issues; it does not mandate any substantive result. Therefore, the Court reviews decisions in this area under APA standards. *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 194 (D.C.Cir.1991), *cert. denied,* 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991); *Tongass Conservation Society v. Cheney,* 924 F.2d 1137, 1140 (D.C.Cir.1991). Similarly, the Court applies an APA standard of review to challenges of agency compliance with Section 4(f). *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). Therefore, the Court will review all agency decisions or determinations in this case under the deferential APA standard.[4]

Under that standard, the Court may set aside only those final actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(a)(2). The Court's role is not to judge the wisdom of decisions but is simply to consider whether the decisions were based on a consideration of relevant factors and whether there was a "clear error of judgment." *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824.

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). There is a genuine issue of fact only if there is such evidence that a reasonable jury could return a verdict for the non-moving party; a fact is material only if it might affect the outcome of the suit under applicable law. *Id.* at 248, 106 S.Ct. at 2510.

The present case does not present substantial questions of fact. The Court has a voluminous administrative record that documents the review process undertaken by defendants. There is no dispute as to the documents contained in the record, only as to what those documents mean. Thus, the primary issues in this case are legal questions of whether defendants have acted properly according to the relevant statutes and regulations, not factual questions of what defendants actually did. These questions are properly resolved at the summary judgment stage.

## III. NEPA Counts

Plaintiffs argue that defendants have violated the NEPA in two ways. First, they argue that defendants failed to adequately consider the improvement and use of existing roadways as an alternative to the building of a new, four-lane highway, which defendants have chosen as the Preferred Alternative. Second, they argue that defendants have made changes in the Preferred Alternative since the completion of the FEIS, and that these changes require the preparation of a Supplemental EIS (SEIS) before the project can proceed.

---

**3.** In their briefs, plaintiffs effectively abandon Count Two, so the Court need not address it.

**4.** The Supreme Court has declined to review this category of agency decisions under a reasonableness standard. *Marsh v. Oregon Natural Re-*

*sources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Instead, the Court prescribes the use of the more deferential APA standard.

A. *Consideration of Alternatives in FEIS and ROD (Count One)*

Plaintiffs argue that the FHWA failed to properly consider alternatives to the Preferred Alternative. Specifically, plaintiffs argue that there was insufficient consideration of their favored alternative—the Improved Roadway Alternative (IRA) or Resurfacing, Restoration, Rehabilitation (RRR)—which consists of taking existing two-lane roadways and improving them to handle increased traffic.[5] Defendants contend that they looked at the alternative and that they decided that it could not meet the needs of the project. However, defendants did not discuss the alternative extensively in the FEIS or ROD.

■ Under NEPA, defendants cannot identify a Preferred Alternative without considering and discussing other alternative means of achieving their goal. To that end, the FEIS must contain a discussion of these alternatives to the chosen plan. 42 U.S.C. § 4332(2)(C)(iii). However, NEPA does not require an agency to ultimately choose one alternative or another; it only requires that the agency take a "hard look" at environmental impact and at all alternatives. *City of Grapevine, Texas v. Department of Transportation*, 17 F.3d 1502, 1504 (D.C.Cir.1994); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C.Cir.1991). *See also Laguna Greenbelt, Inc. v. United States Department of Transportation*, 42 F.3d 517 (9th Cir.1994); *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533 (11th Cir.1990).

■ NEPA does not describe how many alternatives—or which alternatives—an agency must discuss in the FEIS, and CEQ regulations state only that an agency must discuss those alternatives that are reasonable and feasible. 40 C.F.R. § 1502.14. Courts have interpreted this to impart a "rule of reason" that governs both the agency's choice of alternatives to discuss and the extent to which it discusses them. *City of Grapevine*, 17 F.3d at 1505; *Burlington*, 938 F.2d at 195–96. Under this rule of reason, as long as the agency makes these choices reasonably in light of the goals, needs, and purposes that it has set for the project, its discussion of alternatives is upheld. *Burlington*, 938 F.2d at 196. Therefore, the Court's inquiry is limited to whether defendants reasonably chose to limit their discussion of the IRA, in light of the goals, needs, and purposes they have defined for the project.

■ The FEIS and ROD discuss the IRA, but do not include much detailed description. *See* FEIS at II–28 to II–30; ROD at 2,6,8. Plaintiffs assert that defendants never really considered the IRA as an alternative to the chosen Build Alternative, and that defendants' reasons for rejecting the IRA are inconsistent. Plaintiffs therefore argue that this behavior is arbitrary and capricious under NEPA and the APA.

The record does not support plaintiffs' arguments, however. Although the FEIS only devotes two pages to a discussion of the IRA, that document references earlier studies in which the alternative was considered and discussed in more detail. Defendants first considered the IRA in the CSDEIS. In that document, defendants discussed three alternatives, including the IRA[6], that were being rejected because they failed to meet the project's stated goals and needs. The CSDEIS devotes over four pages to a discussion of the IRA, and it concludes that roadway deficiencies, safety concerns, and regional linkage problems preclude the IRA from meeting the project's needs. *See* CSDEIS at II–3 to II–7.

Even though the discussion of the IRA in the CSDEIS may have been sufficient to satisfy NEPA requirements, defendants continued to consider the alternative. In response to comments they received after issuing the CSDEIS, defendants gave the IRA

---

5. Plaintiffs call the alternative the "RRR"; defendants call the plan the "IRA". Although the improved roadway alternatives produced by plaintiffs and defendants vary slightly in their details, they are all essentially the same in that they envision the use of existing roads, improved to handle more traffic, instead of building new highways.

6. The other two rejected alternatives were the Transportation Systems Management Alternative and the Mass Transit Alternative. Unlike the IRA, these alternatives were rejected with only summary discussion and were never revived for later consideration.

substantial consideration in preparation of the ASDEIS. In that document, defendants considered the IRA along with other alternatives over a range of issues and again concluded that the IRA would not meet the project's needs. *See* ASDEIS at S–8 to S–24 and at Section II.

The record indicates that defendants did give substantial consideration to the Improved Roadway Alternative. Defendants concluded that the alternative suffered from significant, insurmountable structural and functional deficiencies, and that it would not meet the goals and needs of the project.[7] Defendants discussed these conclusions at length in the CSDEIS and in the ASDEIS, and defendants summarized these conclusions in the FEIS. Defendants' discussion and consideration of the alternative does not appear to be unreasonable, nor do defendants' reasons for rejecting the alternative appear capricious. Therefore the Court finds that defendants considered and rejected the Improved Roadway Alternative reasonably in light of the goals, needs, and purposes that they set for the project.[8] For this reason, summary judgment in favor of defendants is proper on Count One of the Complaint.

### B. Preparation of a Supplemental EIS (Count Three)

■ The subject of post-decision impact statements is not directly addressed in NEPA. However, CEQ regulations require that an agency prepare an SEIS if there are significant new circumstances or information that create new environmental impacts that were not considered in the FEIS. 40 C.F.R. § 1502.9; *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989). *See also, Laguna Greenbelt*, 42 F.3d at 529; *Hickory Neighborhood Defense League v. Skinner*, 893 F.2d 58, 62 (4th Cir.1990). However, not every change requires an SEIS; only those changes that cause effects which are significantly different from those already studied require supplementary consideration. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989); *Hickory Neighborhood*, 893 F.2d at 62 (SEIS necessary only if "seriously different picture" than already considered). If the effects of the new circumstances had already been considered in an EIS, then no supplement is required. *Hickory Neighborhood* at 63.

■ Once again, the Supreme Court has adopted a "rule of reason" for evaluating an agency's determination of whether an SEIS is necessary. *Marsh*, 490 U.S. at 373, 109 S.Ct. at 1859. Thus, although the Court must examine an agency's decisions, the ultimate standard of review is narrow, and only those decisions that are arbitrary or capricious may be set aside. *Id.* at 378, 109 S.Ct. at 1861–62.

It is undisputed that defendants changed the alignment of the proposed highway around the Corricks Ford Battlefield.[9] Defendants changed the alignment after the Keeper of the National Registry defined the borders of the battlefield and defendants discovered that the old alignment would "use" the battlefield and possibly run afoul of § 4(f) of DOTA. The new alignment generally runs within the 2000–foot wide "D–5" corridor

---

7. Contrary to plaintiffs' contentions, the Court cannot find that these conclusions are inconsistent or are merely "post-hoc" rationalization. For example, while plaintiffs argue that defendants never cited speed concerns as a problem with the IRA, defendants specifically state that the IRA is not suitable because "a considerable number of relocations would be required in order for the horizontal alignment to conform to the 50 mph design speed." CSDEIS at II–5.

8. Plaintiffs may also be in effect challenging the stated goals, needs, and purposes for the project. For example, at the hearing, plaintiffs argued that the goal of economic development might be better served by improving existing roadways

that highlight and give easier access to the state's many tourist sites. However, such a challenge is very difficult to make, since an agency's definition and application of goals, needs, and purposes is given great deference as long as the agency gave the decision "reasoned consideration." *City of Grapevine*, 17 F.3d at 1506. There is no suggestion that defendants did not give such consideration, so the Court cannot second-guess defendants' definition of goals and needs for the project.

9. Plaintiffs had also alleged that the alignment had changed in the Big Run Bog area, but they appear to have abandoned that argument and do not address it in their briefs.

studied in the ASDEIS, but in some places shifts beyond that corridor.

Plaintiffs argue that this shift will inflict a different environmental impact, and that defendants must therefore prepare an SEIS to study the new alignment. It is undisputed that the alignment shift occurred before either the FEIS or ROD were issued; however, the shift occurred subsequent to the major alignment studies discussed in the ASDEIS. Plaintiffs therefore argue that, although the FEIS and ROD were issued after the shift, they fail to include sufficient study of the effects of the changed alignment.

Defendants argue that the alignment shift was made to avoid use of the battlefield, and that the effects of the new alignment are therefore less severe than before. More importantly, defendants assert that the effects of this type of shift were studied at the ASDEIS stage, and therefore that the shift will not produce any novel effects that have not already been studied and considered in an EIS. At most points, the new alignment remains within the "D–5" corridor, and the shifted alignment primarily follows the "Line S" alignment that was studied at length in the ASDEIS. As to the few points at which the new alignment falls outside the "D–5" corridor, defendant WVDOT studied the alignment and concluded that the new area "involved resource types comparable to those located within the battlefield itself." ROD at 11. From that conclusion, WVDOT determined that an SEIS was not necessary.

In determining whether to issue an SEIS, an agency need only take a "hard look" at the evidence and determine whether any significant, new impacts will result from the changed circumstances. *Marsh*, 490 U.S. at 374–77, 109 S.Ct. at 1859–61. The record in this case demonstrates that defendants took such a hard look at the new alignment and determined that it imposed no significant effects beyond those studied in the expansive ASDEIS. While plaintiffs may disagree, they cannot show that defendants' decision was arbitrary or capricious; therefore, it is deserving of deference. For this reason,

summary judgment in favor of defendants is proper on Count Three of the Complaint.

## IV. Section 4(f) Counts

Section 4(f) of the Department of Transportation Act imposes a strict control on highway projects by generally prohibiting approval of any project that requires the "use" of certain protected sites, such as "historic site[s] of national, State, or local significance." 49 U.S.C. § 303. The statute permits approval of such projects only if (1) there is no other "feasible and prudent alternative" and (2) the project includes "all possible planning to minimize harm" to the protected sites. *Id.* The statute therefore raises a significant substantive hurdle for projects which use protected sites.

Compliance with Section 4(f) necessarily proceeds in stages. First, an agency must decide which resources might be protected under the statute. Second, the agency determines whether a project will "use" any of those resources. Only if there is some "use" does the agency proceed to the third stage to consider alternatives or mitigation.

Defendants in the present case have determined that there is no use of Section 4(f) resources—and therefore no need to progress past the first two stages—but plaintiffs challenge defendants' actions at each of the first two stages. First, plaintiffs argue that defendants improperly issued the FEIS and ROD before completing the process of identifying protected resources. Second, plaintiffs challenge defendants' substantive determination that the Preferred Alternative will not "use" any Section 4(f) properties.

### A. Identification of Protected Resources (Count Four)

Section 4(f) is triggered only if a project "uses" protected sites. In the case of historical sites, only those sites protected under Section 106 of the National Historic Preservation Act [10]—meaning those sites "on or eligible for the National Register of Historic Places"—are protected under Section 4(f). 23 C.F.R. § 771.135(e). The agency must decide which sites are protected; in deter-

---

10. This section is found at 16 U.S.C. § 470f.

mining which sites are eligible for the Registry, the agency is directed to consult the State Historic Preservation Official and other appropriate local officials for guidance. *Id.*

■ Because Section 4(f) duties with respect to historic sites are tied to a review of historic resources under Section 106 of the NHPA, it follows that an agency must complete its Section 106 determinations before it can begin compliance with Section 4(f). In the present case, defendants had not completed the Section 106 process at the time they issued the ROD. *See* ROD at 15–16. Recognizing this, defendants issued the ROD anyway, but made final approval of the project contingent upon compliance with a "Programmatic Agreement" that mandates completion of the Section 106 process. Furthermore, although defendants have consistently modified their plans in order to comply with Section 4(f), full compliance with that statute is not possible until the Section 106 process is complete and all historic sites are identified. Therefore, defendants have mandated that if a new historic property is identified during the ongoing Section 106 process, a new Section 4(f) evaluation must be completed, and compliance with Section 4(f) must be ensured prior to final approval of the project. *See* ROD at 16–17.

Plaintiffs present two arguments in opposition to this conditional arrangement. First, plaintiffs argue that the arrangement is unreasonable and that it is prohibited by the statute and by the regulations. They argue that the regulations require Section 4(f) compliance to be documented in the FEIS or ROD. Second, plaintiffs argue that the arrangement defeats the purposes of Section 4(f) by preventing full compliance with the statute.

Plaintiffs first argue that the conditional arrangement is unreasonable and is prohibited by the regulations. Normally an agency receives substantial deference for its interpretation of its own regulations, and its interpretation is given controlling weight unless it is plainly erroneous or inconsistent with the regulations. *Thomas Jefferson University v. Shalala,* 512 U.S. 504, 510–12, 114 S.Ct. 2381,

2386, 129 L.Ed.2d 405 (1994); *N.Y. State Department of Social Services v. Bowen,* 835 F.2d 360, 361 (D.C.Cir.1987); *Marathon Oil Co. v. United States,* 807 F.2d 759, 765 (9th Cir.1986). In the present case, the regulations are far from clear on the issue of Section 4(f) timing. There is indeed a regulation directing the agency to "make the section 4(f) approval either in its approval of the final EIS or in the ROD." 23 C.F.R. § 771.135(1). However, the regulation suggests that timing may be less tied to the FEIS and more tied to final approval because it requires only that a Section 4(f) determination be made prior to the approval of "the use of land." 23 C.F.R. § 771.135(a)(1). As stated in the ROD, the approval of actual land use for this project has not yet been given, and is made expressly conditional on compliance with Section 4(f).

Furthermore, defendants have already made a tentative Section 4(f) approval in the FEIS and ROD. Defendants have conducted significant inquiries into the use of historic properties by this project, and have structured their plans to avoid use of protected properties.[11] In the ROD, defendants summarize their research and state that the Preferred Alternative does not "use" any Section 4(f) properties. *See* ROD at 16. The Programmatic Agreement does not undercut that determination; it merely deals with the possibility that defendants might subsequently learn of newly-designated Section 4(f) properties. The regulations contemplate this scenario and provide that a separate Section 4(f) evaluation may be prepared when an agency determines after processing the FEIS "that section 4(f) applies to a property." 23 C.F.R. § 771.135(m)(2).

Most importantly, defendants are faced with a unique situation, because they are attempting to build a 100–plus mile highway as a single project, when normally the project would proceed as a series of smaller 6–10 mile projects. Defendants chose this more difficult route because they believed it would afford them a better opportunity to minimize environmental impact over the entire stretch

---

**11.** Indeed, defendants shifted the alignment of the proposed highway in at least one area—the Corricks Ford Battlefield—to avoid use of a Section 4(f) property.

of highway, whereas a series of smaller, more manageable projects might lead to uneven environmental effects. The cost of this single, unified project is that the vast number of potential protected sites makes certain, full compliance with Section 4(f) impossible to achieve prior to approval of the ROD. However, defendants have made a good faith effort to achieve as certain compliance as is possible at this stage, and have implemented the Programmatic Agreement to ensure that full compliance is achieved before any construction begins in an area.

Plaintiffs also argue that defendants' conditional approach defeats the purposes of Section 4(f). Plaintiffs' argument is based on their concern that the arrangement could lead to less than full compliance with Section 4(f) because, as the project progresses, certain options for avoidance or mitigation may become foreclosed. However, plaintiffs do not present substantial evidence to support this assertion, and defendants flatly deny the possibility. Defendants assert that they have means to avoid use of Section 4(f) properties. These measures include shifting the alignment of the highway, as defendants have already done near the Corricks Ford Battlefield. Furthermore, the language of the Programmatic Agreement and the ROD do not support plaintiffs's contention—the ROD requires full compliance with Section 106 and Section 4(f), and it does not contemplate a lessened standard of compliance with respect to properties identified after the ROD.

Defendants have taken a hard look at the problems associated with Section 4(f) compliance for a project of this magnitude, and have arrived at a practical, functional solution to those problems. Defendant FHWA has considered the arrangement in light of its regulations, and the arrangement is not plainly inconsistent with those regulations. Furthermore, the arrangement does not seem particularly likely to undermine the purposes of the statute. Since FHWA's interpretation of the statute and of its regulations is reasonable and not plainly erroneous, the Court must defer to that interpretation.

Therefore, because the Section 4(f) compliance scheme described in the ROD does not violate the federal statute or regulations, summary judgment for defendants is proper on Count Four of the Complaint.

### B. Determination of Use of Protected Properties (Count Five)

Because Section 4(f) only applies to a project that uses protected sites, the statute therefore requires an agency to determine whether the project will in fact "use" any such sites.[12] 49 U.S.C. § 303; 23 C.F.R. § 771.135(a)(1). Defendants in this case have determined that the Corridor H project "does not use any known Section 4(f) resource." *See* ROD at 16. Plaintiffs challenge this determination and argue that the project will use "numerous historic resources" and other lands. However, plaintiffs have pointed to only three specific properties—the Corricks Ford Battlefield, the Moorfield Battlefield, and the Fernow Experimental Forest—that they contend will be used by the project.

### 1. Ripeness

Defendants first argue that this Count is not ripe for review. Under the conditional arrangement, the ROD is not the final word on Section 4(f) compliance. Therefore, argue defendants, there is not yet any final agency action with respect to any Section 4(f) determinations. Certainly this is true with respect to plaintiffs' concern for the unnamed "numerous historic resources," because defendants openly admit that they are still studying the status of many such "unknown" resources. Because defendants may still be engaged in decision-making on these unnamed, potentially late-discovered Section 4(f) resources, plaintiffs' challenge is not ripe for consideration.

However, defendants make a definitive, apparently final, statement that the Preferred Alternative avoids use of any "known" resources. In the ROD, defendants state that the alignment around the Corricks Ford Battlefield and the Moorfield Battlefield was

---

12. This determination, as with all application of § 4(f), is left to the administrative agency involved. 23 C.F.R. § 771.135(b).

shifted to ensure "that the Preferred Alternative continued to avoid use of any Section 4(f) resources." ROD at 12. Therefore, defendants admit not only that they "know" the two battlefields are Section 4(f) resources, but also that they have determined that the Preferred Alternative will not "use" the resources. There is no suggestion that any further study or consideration is pending. Therefore, it is clear that defendants have made a final determination about the non-use of these resources, and that determination is ripe for review.

Similarly, defendants appear to have determined that the Fernow Experimental Forest is not a Section 4(f) resource; therefore, defendants have determined that they are not required to examine the Preferred Alternative's use of the forest. Once again, while a change in agency opinion is theoretically possible, it does appear that the determination has been made definitively and finally. Therefore, this determination is also ripe for review.

### 2. Review

Plaintiff challenges these Section 4(f) determinations under the Administrative Procedure Act. Therefore, they are entitled to substantial deference unless plaintiff can show that the determinations were arbitrary or capricious. The Court's role is simply to consider whether the decisions were based on a reasonable consideration of relevant facts or whether there was a "clear error of judgment." *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 824.

Defendants have given the impact of the Preferred Alternative on the two battlefields considerable thought and consideration. Indeed, defendants initially determined that the Preferred Alternative would use the properties. In response to that determination, defendants shifted the alignment of the proposed highway away from the battlefields to reduce the environmental impact. As a result, defendants have determined that the new alignment avoids use of the battlefields. Plaintiffs argue that the new alignment continues to "constructively use" the battlefields, but defendants present substantial evidence that they considered both actual and constructive use of the properties and found that the new alignment does neither. Plaintiffs cannot show that this determination was arbitrary, capricious, or not in accordance with law; therefore the Court must give deference to the agency's decision, made in light of substantial evidence.

Defendants have also determined that the Fernow Experimental Forest is not a "wildlife and waterfowl refuge" under 49 U.S.C. § 303(c), and therefore that the forest is not a Section 4(f) resource. By regulation, this determination must be made by "the officials having jurisdiction over the lands" and it must be reasonable. 23 C.F.R. § 771.135(d). Defendants present evidence that they engaged in correspondence with the United States Forest Service on this issue and that they considered substantial information provided by the Forest Service and obtained through independent investigation. Defendants also present evidence that Forest Service officials, including the Director of the Northeast Forest Experimental Station, decided that the forest is not protected as a Section 4(f) resource. Plaintiffs argue that defendants should have consulted with different officials, but plaintiffs do not present any convincing evidence that defendants sought opinions from the wrong persons. Furthermore, while plaintiffs assert that the forest should be protected, they do not demonstrate that the agency decision is unreasonable, much less that it is arbitrary or capricious. Therefore, the Court must grant deference to the agency decision.

Because the Court must give deference to defendant FHWA's determinations as to the Corricks Ford Battlefield, the Moorfield Battlefield, and the Fernow Experimental Forest, and because determinations on as-yet-unnamed properties are not yet ripe for review, summary judgment in favor of defendants is proper on Count Five of the Complaint.

### V. Conclusion

There is room for a difference of opinion about the wisdom of the Corridor H project, and also about the implementation alternatives chosen by defendants. Indeed, plaintiffs present reasonable arguments in favor of choosing another path. However, defendants also present reasonable arguments,

supported by evidence, in support of positions they have taken after considerable consideration. The Court does not substitute its own judgment for that of the agency; instead, the Court is directed to give deference to agency decisions that are not arbitrary or capricious. The agency's decisions and determinations are not arbitrary or capricious, and they are entitled to deference. Therefore, the Court cannot set aside these decisions, and the Court must grant summary judgment in favor of defendants on all counts of the Complaint.

An Order will accompany this Opinion.

### ORDER

Pending before the Court are plaintiffs' and defendants' cross-motions for summary judgment. For the reasons stated in the Court's Memorandum Opinion, it is hereby

**ORDERED** that plaintiffs' motion for summary judgment is **DENIED**; it is further

**ORDERED** that defendants' motion for summary judgment is **GRANTED**; it is further

**ORDERED** that this case is **DISMISSED**.