Paul DAVIS III, et al., Plaintiffs,

v.

John LATSCHAR, et al., Defendants.

No. CIV.A. 97–0232 PLF.

United States District Court,
District of Columbia.

Dec. 31, 1998.
Opinion Denying Reconsideration,
Jan. 26, 1999.

Katherine A. Meyer, Eric R. Glitzenstein, Howard Crystal, Meyer & Glitzenstein, Washington, DC, for Plaintiffs.

Caroline Blanco, David F. Shuey, U.S. Dept. of Justice, Environment & Natural Resources Div., Washington, D.C., for Defendants.

*OPINION*

PAUL L. FRIEDMAN, District Judge.

The National Park Service (the "Park Service") seeks to reinitiate its deer management program for Gettysburg National Military Park ("Gettysburg") and Eisenhower National Historic Site ("Eisenhower"). The program, which calls for park rangers to shoot deer in a controlled harvest to maintain the population density, was in effect in 1996 and 1997. The Park Service suspended the program in July of 1997 because of the pendency of this lawsuit and stipulated that it would not reinitiate the program without an Order from this Court. It has now requested such an Order.

Plaintiffs argue that the Court should enjoin the deer management program because the Park Service has acted contrary to (1) the National Park Service Organic Act ("Organic Act"), 16 U.S.C. § 1 *et seq.*, (2) its management policies implementing the Organic Act, (3) the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and (4) the National Historic Preservation Act ("NHPA"), 16 U.S.C. § 470 *et seq.* Because the Court finds that the Park Service acted consistently with the Organic Act and its implementing guidelines and that it has complied with the procedures of both NEPA and NHPA, the Court grants summary judgment for the Park Service which therefore is permitted to reinitiate its deer management program.

## I. BACKGROUND

Gettysburg and Eisenhower are contiguous parcels of land in rural Pennsylvania that are managed by the National Park Service. Gettysburg was established to "preserve and protect the resources associated with the Battle of Gettysburg and the Soldiers' National Cemetery, and to provide understanding of the events that occurred [there], within the context of American history." *See* Draft General Management Plan and Environmental Impact Statement for Gettysburg National Military Park ("Draft GMP"), Plaintiffs' Exh. E at 7; *see also* An Act to Establish a National Military Park at Gettysburg, Pennsylvania, § 3, 28 Stat. 651 (1895) (codified as amended at 16 U.S.C. § 430g) (The Superintendent of the park shall "ascertain and definitely mark the lines of battle of all troops engaged in the battle of Gettysburg"). Eisenhower was established to preserve the cultural and natural resources of the home of President Dwight D. Eisenhower and to interpret his life and career. *See* Final Environmental Impact Statement for the White–Tailed Deer

Management Plan ("Final EIS") at 3–5, Administrative Record ("A.R.") at 2200–02.

By the early 1980's, the Park Service had become concerned about deer overpopulation in the area of Gettysburg and Eisenhower. In 1985, at the request of the Park Service, Dr. Gerald Storm of Pennsylvania State University and his colleagues began a study of the impact of the deer on the parks "because of concern by the National Park Service resource managers about the intensive deer browsing of tree seedlings in historic woodlots, increasing consumption of farm crops by deer, and high number of deer and automobile collisions." Gerald L. Storm *et al.*, Executive Summary of Population Status, Movements, Habitat Use, and Impact of White-Tailed Deer ("Storm Report") at 1, A.R. at 207. Corroborating the concerns of the resource managers, Dr. Storm found that the browsing of the deer depleted the oak and white ash seedlings needed to maintain the woodlots' historic appearance and that the deer consumed a large percentage of the corn and wheat crop. *Id.* at 3–4, A.R. at 209–10. Dr. Storm recommended that the Park Service reduce the deer population density to a level "at or below the level recommended for Adams County by the Pennsylvania Game Commission." *Id.* at 4, A.R. at 210. This level was 20 deer per forested square mile. *Id.*

Even before the Storm Report was completed, the Park Service had begun to evaluate alternatives for controlling deer population density. In February of 1990, Dr. Gerald Wright of the University of Idaho sent a 100–page draft environmental impact statement ("EIS") to the Park Service that recommended fencing off the protected areas as the preferred approach. *See* R. Gerald Wright, Deer Management Alternatives for Gettysburg National Mili-

tary Park and Associated Environmental Analysis; A Draft Report (1990), A.R. at 3944–4054. While Dr. Wright's report received some initial favorable reviews, it was subsequently rejected as substantively and procedurally inadequate and therefore was used only as a research document. *See* May 7, 1990 Memorandum from Jacob J. Hoogland, Chief, Environmental Quality Division, to Bob Gift, Regional Director, Mid–Atlantic Region, A.R. at 354 ("The draft environmental analysis that we have reviewed informally has neither the substance nor format necessary to suffice as an EIS").

In August of 1992, the Park Service published its Notice of Intent to Prepare a Draft Environmental Impact Statement in the Federal Register; the notice described a range of alternatives that might be used to control deer population density. *See* 57 Fed.Reg. 3806 (1992), A.R. at 984. The Park Service noticed and held two open meetings to gather information from the public on the desired scope of the EIS. *See* Minutes of the January 7 Meeting on White-tailed Deer Management at Gettysburg National Military Park/Eisenhower National Military Site Held at Penn State, A.R. at 1111–15; Environmental Impact Statement Meeting, February 27th, 1993, A.R. at 1169–75. In both the draft environmental impact statement that it released in 1994 and the final environmental impact statement it released in 1995, the Park Service explicitly considered a range of alternatives, including the fencing alternative proposed by Dr. Wright and endorsed by plaintiffs in this litigation. *See* Draft Environmental Impact Statement for the White–Tailed Deer Management Plan ("Draft EIS") at 24–42, A.R. at 1888–1906; Final EIS at 24–42, A.R. at 2221–41.[1] The Park Service then published its

---

1. The Park Service created a list of alternatives using suggestions from the public and Park Service personnel and by reviewing the available literature. *See* Final EIS at 23, A.R. at 2220. The Park Service eliminated nine alternatives from detailed study after initial consideration. These alternatives were: (1)

restoration of predators, (2) deterrents, (3) repellants, (4) poison, (5) public hunting, (6) fencing, (7) conversion of cropfields to pasture or hay and grasses, (8) deer as a commodity, and (9) landowner privilege. *Id.* at 24–30, A.R. at 2221–27. The Park Service then evaluated the five alternatives it consid-

Record of Decision ("ROD"), choosing to manage the population density through a controlled harvest (*i.e.*, shooting the deer to reduce their density), and began the hunt in the fall of 1996. Record of Decision ("ROD"), A.R. at 3570–76.

Plaintiffs brought suit in February of 1997 to enjoin the shooting of the deer. After briefing had begun on plaintiffs' motion for summary judgment, the Park Service moved to stay the litigation, arguing that it would eliminate the issues in the lawsuit by suspending the deer management program while revisiting its compliance with the applicable laws. *See* Defendants' July 25, 1997 Motion for Temporary Stay of Litigation at 1–2. The Park Service also revealed that soon after plaintiffs filed their complaint it had initiated procedures to comply with the National Historic Preservation Act. *See* Transcript of August 12, 1997 Motions Hearing at 7–8. After the parties agreed that the deer management program would not be reinitiated without an Order from this Court and formulated procedures to ensure plaintiffs' involvement in the NHPA process, the Court stayed the litigation. *See* August 15, 1997 Joint Stipulation.

The Park Service now has conducted what it believes to be a sufficient NHPA process. It has prepared a Section 106 report analyzing the possible "adverse effects" of the deer management program on Gettysburg and Eisenhower, including its effect upon "location, design, setting, materials, workmanship, feeling [and] association," 36 C.F.R. § 800.9(b), and it has concluded that the program would have no "adverse effects." *See* Section 106 Case Report; White–Tailed Deer Management, A.R. at 6352–62. The Park Service then sought the concurrence of the State His-

toric Preservation Officer ("SHPO") and, pursuant to the parties' joint stipulation, allowed the plaintiffs to submit their own materials. *See* Letter from Dr. John A. Latschar, Superintendent of Gettysburg National Military Park to Brenda Barrett, Director, Pennsylvania Bureau of Historic Preservation, A.R. at 6349–51; Letter from Katherine Meyer to Dr. Brent D. Glass and Brenda Barrett, A.R. at 6363–70. The SHPO agreed with the Park Service that there would be no "adverse effects." *See* Letter from Brenda Barrett to Dr. John A. Latschar, Superintendent of Gettysburg National Military Park, A.R. at 6371. The same process was used to seek the approval of the Advisory Council on Historic Preservation ("ACHP"). After obtaining the views of the Keeper of the National Register on plaintiffs' arguments, the ACHP also agreed with the finding of "no adverse effect." *See* Letter from Don L. Klima, Advisory Council on Historic Preservation to Dr. John A. Latschar, Superintendent of Gettysburg National Military Park, A.R. at 6504–06.[2]

On June 19, 1998, the Park Service declared its intent to reinitiate the deer management program. In August of 1998, the Park Service released a new draft General Management Plan ("draft management plan" or "Draft GMP") for Gettysburg. Based on new research on the Battle of Gettysburg and its relationship to Gettysburg's terrain, the draft management plan recommended adjusting the landscape to better reflect its state at the time of the battle. *See* Draft General Management Plan and Environmental Impact Statement for Gettysburg National Military Park ("Draft GMP"), Plaintiffs' Exh. E at 59–60. In the draft management plan's preferred alternative, the Park Service proposed cut-

---

ered most viable in more detail. The second group of alternatives were: (1) no action, (2A) capture and transfer, (2B) direct reduction (shooting the deer), (3) reproductive intervention (contraception), (4) cooperative management with Pennsylvania authorities, and (5) combined management (a combination of 2B and 4). *Id.* at 30–42, A.R. at 2227–41.

**2.** The ACHP consulted with the Keeper of the National Register regarding what traits Gettysburg possessed that would qualify it for the National Register. *See* Letter from Donald Klima, Advisory Council on Historic Preservation to Carol Shull, Keeper of the National Register of Historic Places, A.R. at 6464–65.

ting 576 acres of non-historic woodlands, altering 278 acres of non-historic woodlands to reflect historic woodlots and shifting the agriculture to historical field patterns. *See id.* at 122–28. All proposals considered under the draft management plan were premised on achieving a deer density goal of 25 deer per forested square mile, as well as the objective of maintaining the historic woodlots and croplands. *See id.* at 74–75, 108–64.

## II. DISCUSSION

### A. Standard of Review

The Court may set aside the decision of the Park Service to reinitiate the deer management program only if that decision was arbitrary and capricious, not in accordance with the law or unwarranted by the facts. 5 U.S.C. § 706(2)(A). For challenges to an agency's construction of the statutes or regulations that it administers—such as the Park Service's reading of its Organic Act and management policies—the Court's review must be particularly deferential. The Court must defer to the agency's interpretation of a statute that it implements "so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language." *OSG Bulk Ships, Inc. v. United States,* 132 F.3d 808, 814 (D.C.Cir.1998) (quoting *Coal Employment Project v. Dole,* 889 F.2d 1127, 1131 (D.C.Cir.1989)); *see Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Similarly, provided it does not violate the Constitution or a federal statute, an agency's interpretation of its own regulations "will prevail unless it is 'plainly erroneous or inconsistent' with the plain terms of the disputed regulations." *Everett v. United States,* 158 F.3d 1364, 1367 (D.C.Cir.1998) (quoting *Auer v. Robbins,* 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)); *see Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993); *Amerada Hess Pipeline Corp. v. FERC,* 117 F.3d 596, 600 (D.C.Cir.1997).

The standard of review for agency decisions is highly deferential:

> [T]he Court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *see Motor Vehicles Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). The Court's "task is to determine 'whether the agency's decisionmaking was reasoned,' . . . i.e., whether it considered relevant factors and explained the facts and policy concerns on which it relied, and whether those facts have some basis in the record." *National Treasury Employees Union v. Horner,* 854 F.2d 490, 498 (D.C.Cir.1988) (quoting *American Horse Protection Ass'n. Inc. v. Lyng,* 812 F.2d 1, 5 (D.C.Cir.1987)).

### B. The National Park Service Organic Act and Policies

Under the National Park Service Organic Act, the Secretary of the Interior "may . . . provide in his discretion for the destruction of such animals and of such plant life as may be detrimental to the use of any said parks, monuments, or reservations." 16 U.S.C. § 3. Because the Organic Act is silent as to the specifics of park management, the Secretary has especially broad discretion on how to implement his statutory mandate. *See Daingerfield Island Protective Soc'y v. Babbitt,* 40 F.3d 442, 446 (D.C.Cir.1994); *see also Bicycle Trails Council v. Babbitt,* 82 F.3d 1445, 1454 (9th Cir.1996) (adopting the district court's opinion); *Intertribal Bison Coop. v. Babbitt,* 25 F.Supp.2d 1135 (D.Mont.1998). Still, a "finding of detriment" is necessary before the Park Service may engage in a

"controlled harvest" such as the one proposed by the Park Service in its deer management program. *Intertribal Bison Coop. v. Babbitt,* 25 F.Supp.2d at 1138–39 ("pursuant to § 3 of the Organic Act and Park Service policy a finding of detriment is necessary to justify a controlled harvest, ... but an explicit finding of detriment is not otherwise necessary to justify the destruction of wildlife ...."); *see also* General Regulations for Areas Administered by National Park Service, 48 Fed.Reg. 30,-252, 30,264 (1983) (controlled harvest "will be utilized only when a finding of 'detriment,' based on scientific documentation, has been made by the superintendent, and it is determined that removal is an acceptable method of resource management").

█ The Park Service claims that it made a sufficient "finding of detriment" to justify the destruction of the deer under the Organic Act when it concluded that overbrowsing by deer in the historic woodlots and cropfields was detrimental to the purposes of the parks.[3] As is reflected at several points in the record, the Park Service determined that the overbrowsing was preventing it from achieving the parks' objectives of preserving the historic appearance of the woodlots and cropfields, components of the landscape critical to the understanding and interpretation of the historic events that took place in each park. *See, e.g.,* ROD at 2, A.R. at 3571 ("Management objectives for maintaining landscape components, specifically historic woodlots and cropfields, were developed to enhance visitor understanding of each park's events"). For example, in its Record of Decision initiating the deer management program, the Park Service concluded that

> [d]ata from the [Storm Report] showed that the woodlots and cropfields could not be maintained in a way necessary to achieve park objectives. The high level

of deer browsing was preventing a sufficient number of tree seedlings from becoming established, which is needed to perpetuate the historic woodlots. The agricultural program was unable to grow historical crops to maturity in Eisenhower NHS and the southern part of Gettysburg NMP due to deer browsing.

*Id.* at 3, A.R. at 3572. The Court concludes that Park Service made a sufficient "finding of detriment" on the record to satisfy the requirements of the Organic Act.

Plaintiffs contend, however, that the "finding of detriment" made by Park Service is arbitrary and capricious because it is inconsistent with the alleged admission by the Park Service in its draft management plan that the cropfields and woodlots do not need protection because they do not reflect the historic landscape. Contrary to plaintiffs' assertion, the draft management plan contains no such admission. The plan proposes to eliminate only *non-historic* woodlands. *See* Draft GMP at 122. The perpetuation of the *historic* woodlots and croplands is still necessary to achieve park objectives under the draft management plan. Nothing in the record suggests that the threats to these historic resources from deer overbrowsing—*i.e.,* the suppression of oak and white ash seedlings and excessive crop loss—are any less likely to occur in the new management regime than at the time the Park Service issued its decision to institute the deer management program. The "finding of detriment" by the Park Service therefore is not undermined by the draft management plan and may still justify the "destruction" of deer under the Organic Act.

If the Organic Act were the only authority limiting the management discretion of the Park Service, the analysis would end here. But the Park Service has further

---

**3.** Despite plaintiffs' contentions that the Park Service was acting in the economic interests of certain tenant farmers in making this determination, the Court concludes that the record does not demonstrate that the Park Service had any such ulterior motive. It was not unreasonable for the Park Service to have kept the farmers informed about efforts to control the deer and to respond to their concerns in writing.

bound its own discretion through the adoption of Management Policies.[4] The Management Policies provide that

> [u]nnatural concentrations of native species caused by human activities may be controlled if the activities causing the concentrations cannot be controlled . . . . Animal populations or individuals will be controlled . . . in cultural or development zones when necessary to protect property or landscaped areas.

National Park Service Management Policies ("Park Service Management Policies"), Plaintiffs' Exhibit I at 4:6. Plaintiffs argue that the Park Service has violated these policies because it has opted to control the deer overpopulation without first exhausting the available means to regulate the human activities causing the overpopulation. In particular, plaintiffs again point to the draft management plan as evidence that the deer population could be reduced by controlling "human activities" such as the decisions of the Park Service regarding the maintenance of Gettysburg's woodlands and cropfields.

The Park Service asserts that the Court does not need to reach the merits of plaintiffs' argument because plaintiffs have misread the Management Policies. The Park Service maintains that the statement that "[a]nimal populations . . . will be controlled in cultural . . . zones when necessary to protect property or landscaped areas" is meant as an exception to the preceding sentence requiring that the Park Service attempt first to control human activities before looking to control the animal populations. As a result, the Park Service argues that once it found that Gettysburg and Eisenhower were "cultural zones" with landscaped areas in need of protection, it was entitled to control the deer population directly without first seeking to control human activities.[5]

■ While the language of the Management Policies could be interpreted either as plaintiffs read it or as the Park Service does, the interpretation of the Park Service is plausible; it certainly is not "plainly erroneous or inconsistent" with the policies and therefore must prevail over plaintiffs' reading. *See Everett v. United States*, 158 F.3d at 1367. The first excerpted sentence describes two alternatives for addressing overpopulation of native species— control of the animal population and control of the human activities that caused the "unnatural concentrations" or overpopulation—and announces a preference for the latter. The second excerpted sentence discusses only one of these two alternatives—control of the animal population—in the context of cultural or development zones. When these two sentences are juxtaposed, the reading of the second sentence as an exception to the first sentence's preference for the control of human activities is not unreasonable. If the Park Service intended to express a preference for the control of human activities when addressing overpopulation in cultural or development zones, it is reasonable to expect that it would have explicitly discussed this alternative technique in the second sentence, as it had in the first. It did not do so. The interpretation of the Management Policies proffered by the Park Service is not "plainly erroneous or inconsistent" with the plain terms of the policies and therefore is entitled to deference.

---

4. Whether the Park Service is bound by its Management Policies turns on "the agency's intent to be bound." *Vietnam Veterans of America v. Secretary of the Navy*, 843 F.2d 528, 538 (D.C.Cir.1988). Plaintiffs contend that the Park Service demonstrated the requisite intent in the Forward to policies when it stated that "[a]dherence to policy will be mandatory unless waived or modified by an appropriate authority." National Park Service Management Policies, Plaintiffs' Exhibit I at ix. Since defendants' did not challenge this assertion, the Court finds that the Park Service intended to be bound and is bound by the policies.

5. Plaintiffs do not contest the Park Service's position that Gettysburg and Eisenhower are cultural zones and that their landscaped areas need protection.

## B. NEPA

Plaintiffs challenge the deer management program under NEPA on two grounds. First, they argue that the Park Service did not consider many reasonable alternatives in its final EIS. Second, they argue that the Park Service must prepare a supplemental EIS as a result of the changes in park management that are considered in the draft management plan. Because the Court finds that the Park Service considered a full range of reasonable alternatives and was within its discretion by opting not to prepare a supplemental EIS, the Court concludes that the Park Service fully complied with NEPA's procedural requirements.

### 1. Reasonable Alternatives

The regulations implementing NEPA require an agency to "specify the underlying purpose and need to which the agency is responding" and to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. §§ 1502.13, 1502.14. The courts have recognized that these requirements are interrelated because "the goals of an action delimit the universe of the action's reasonable alternatives." *Citizens Against Burlington v. Busey,* 938 F.2d 190, 195 (D.C.Cir.1991). The setting of the objectives and the range of alternatives to be considered by an agency are governed by a "rule of reason." *See City of Grapevine v. Dept. of Transp.,* 17 F.3d 1502, 1506 (D.C.Cir.1994); *Citizens Against Burlington v. Busey,* 938 F.2d at 195. The Court must uphold "an agency's definition of objectives so long as the objectives that the agency chooses are reasonable, and ... uphold its discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail." *Citizens Against Burlington v. Busey,* 938 F.2d at 196.

▮ Plaintiffs assert that the Park Service unfairly narrowed its objective for the deer management program from the perpetuation of historic resources to the control of deer population so as to eliminate reasonable alternatives. This argument is not supported in the record. In an internal memorandum drafted early in the NEPA process, the Park Service asserted that the objective of the program was "not to reduce the deer population but to perpetuate the significant elements of the cultural landscape." Program Review and Project Data Sheet for Deer Management at GETT, A.R. at 168. In the Final EIS, the Park Service stated that "a management action is needed to control the browsing effects of white-tailed deer in the parks." Final EIS at 13, A.R. at 2210. In the context of the Storm Report's conclusion that the overbrowsing of the deer was threatening the historic resources of Gettysburg, *see* Storm Report at 4, A.R. at 220, these statements of objective are the same.

Even if the Park Service's alteration of the objective's wording were suspicious, any suspicions are allayed by its thorough consideration of all alternatives. In its draft EIS and its final EIS, the Park Service initially considered and rejected a wide range of non-lethal alternatives, including alternatives such as fencing and altering cropfield patterns as suggested by plaintiffs. *See* Draft EIS, A.R. at 1892; Final EIS, A.R. at 2225–26. The Park Service then proceeded to evaluate in more detail the five alternatives it considered most viable. *See* Final EIS at 30–42, A.R. at 2227–41; *see also supra* at note 1. It is apparent from a review of both the draft EIS and the final EIS that the Park Service weighed all of the reasonable alternatives and came to a fully-informed decision. This is all that NEPA requires. *See Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227–28, 100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (NEPA is only procedural and does not mandate a substantive result); *Environmental Defense Fund v. Massey,* 986 F.2d 528, 532 (D.C.Cir.1993) (NEPA "does not dictate

agency policy or determine the fate of contemplated action").

Plaintiffs raise only one alternative not considered in the Final EIS—the cutting of the non-historic woodlands pursuant to the draft management plan. This cannot be viewed as a "reasonable alternative," however, because it would not further the objective of reducing browsing in *historic* areas. As the draft management plan noted, the cutting of the non-historic woodlands would not reduce the desired deer population density. *See* Draft GMP at 255. Since it is deer population density that needs to be controlled in order to preserve the parks' historic resources, cutting the non-historic woodlands would not further the deer management program's objective. Furthermore, the record suggests that cutting non-historic woodlands may even exacerbate the problem by driving the deer into the historic areas. *See* Storm Report at 5, A.R. at 211 (deer displaced by fencing "would be forced into other areas where their impact would be intensified"). Cutting the non-historic woodlands therefore is not an alternative that the Park Service had to consider.

### 2. Supplemental EIS

An agency is required to prepare a supplemental EIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9. "[N]ot every change requires [a supplemental EIS]; only those changes that cause effects which are significantly different from those already studied require supplementary consideration." *Corridor H Alternatives, Inc. v. Slater,* 982 F.Supp. 24, 30 (D.D.C.1997). The decision to prepare a supplemental EIS is again governed by the "rule of reason" and reviewed by the courts under the "arbitrary or capricious" standard of the APA. *Marsh v. Oregon Natural Re-*

*sources Council,* 490 U.S. 360, 373–75, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) ("[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable"). Because the decision whether to prepare a supplemental EIS involves technical issues within the agency's area of expertise, courts generally "defer to the 'informed discretion of the responsible federal agencies.' " *Id.* at 377, 109 S.Ct. 1851 (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)).

Plaintiffs argue that the draft management plan, issued after the preparation of the final EIS, contains new proposals for managing Gettysburg's historic resources that will have a significant impact on the deer population, thus requiring the Park Service to prepare a supplemental EIS. Under the preferred alternative of the draft management plan, non-historic woodlands will be cut, other woodlands will be thinned to take on the appearance of historic woodlots and new field patterns may reduce the availability of crops to the deer. *See* Draft GMP at 122–28. Plaintiffs argue that these steps will lead to a reduction in the deer population. Once again, plaintiffs have improperly focused the inquiry. The deer management program is intended to maintain the deer population *density,* not the total deer population. To constitute "significant new circumstances or information" requiring a supplemental EIS, the draft management plan would have to have a significant effect on the deer population density needed to sustain the historic properties of the parks.

■ Plaintiffs have failed to demonstrate that the draft management plan would have any impact on the desired deer population density.[6] After years of study,

---

6. Plaintiffs also contend that the changes in the draft management plan might eliminate the need for any shooting because the deer will be driven outside the parks in search of

cover and food. This contention, however, does not undermine the justification for the deer management program. If the deer migrate out of the parks as the plaintiffs contend

the Park Service has determined that a deer population density of 25 deer per forested square mile is the appropriate level necessary to conserve the historic resources of Gettysburg and Eisenhower. The target density is intended to ensure that there are adequate seedlings to regenerate the young oak and white ash trees that make up the historic woodlots and to ensure adequate crop production to "tell the stories" of the parks. *See, e.g.,* Final EIS at 9,12, A.R. at 2206, 2209. The proposals in the draft management plan to cut non-historic woodlands, convert other woodlands into historic woodlots and change agricultural field patterns do not "cause effects which are significantly different from those already studied." *Corridor H Alternatives, Inc. v. Slater,* 982 F.Supp. at 30. Specifically, the Park Service found that the historic resources will not be changed under the draft management plan in a manner that alters the need to control overbrowsing through the maintenance of the desired deer population density. Because the Court has no reason to question the exercise of discretion by the Park Service in its area of expertise, it concludes that the decision not to prepare a supplemental EIS was not arbitrary and capricious.[7]

### C. The National Historic Preservation Act

Under Section 106 of the National Historic Preservation Act, the Park Service "shall ... take into account" the effects of any undertaking on a "site ... included in or eligible for the National Register." 16 U.S.C. § 470f. In assessing the effects of its undertaking, the Park Service is required to "afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking." 16 U.S.C. § 470f. If the effects are "adverse," the agency is required to consider means for alleviating the impacts after consulting the State Historic Preservation Officer ("SHPO"), the Advisory Council on Historic Preservation ("ACHP") and the public. 36 C.F.R. § 800.5. "Adverse effects" are defined as any "effect on a historic property [that] may diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association" and expressly include the "[i]ntroduction of visual, audible, or atmospheric elements that are out of character with the property or alter its setting." 36 C.F.R. § 800.9(b). The requirements of Section 106, however, do not require the Park Service to engage in any particular preservation activities; rather, Section 106 only requires that the Park Service consult the SHPO and the ACHP and consider the impacts of its undertaking. *See Nat'l Trust for Historic Preservation v. Blanck,* 938 F.Supp. 908, 918 (D.D.C.1996) ("Section 106 is universally interpreted as requiring agencies to consult and consider and not to engage in any particular preservation activities per se").

---

they will, the Park Service will not shoot the deer, or will shoot fewer deer, because the deer population density will fall to an acceptable level. *See also* ROD at 5, A.R. at 3574 ("When the population is reduced to the density goal, fewer deer will need to be killed annually to maintain the population at that level").

7. Plaintiffs also argue that the Court should disregard the arguments the Park Service made for the first time in this Court as *post hoc* rationalizations that cannot support its decision. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. at 50, 103 S.Ct. 2856. It appears from the record, however, that the Park Service never made the arguments before because plaintiffs never requested a supplemental EIS or argued that one was required until they raised the issue in this Court. Because the decision whether a supplemental EIS is required should be made initially by the agency, not by a reviewing court, plaintiffs should have made a request to the Park Service and allowed it to make a decision. *Friends of the River v. FERC,* 720 F.2d 93, 109 (D.C.Cir. 1983). Nevertheless, the Court need not consider the effect of plaintiffs' failure to raise the issue earlier because it rejects the request on its merits. *Id.*

Plaintiffs do not argue that the Park Service failed to comply with the procedural requirements of Section 106. Instead, they assert that the Park Service in its review process ignored the primary argument presented by plaintiffs. Specifically, during the review process, plaintiffs maintained that the deer management program's effect on Gettysburg's "quiet contemplative atmosphere" was an adverse effect under the regulations of the Advisory Council on Historic Preservation. Plaintiffs based this argument on an excerpt from the National Register for Historic Places Bulletin on historic battlefields which described battlefields as "places of quiet contemplation." National Register for Historic Places Bulletin No. 40, Guidelines for Identifying, Evaluating, and Registering America's Historic Battlefields ("Bulletin No. 40"), Plaintiffs' Exhibit G at 3. Because the SHPO, the ACHP and the Keeper of the National Register did not address or even mention Bulletin No. 40 in reviewing the deer management program, plaintiffs maintain that the finding of no "adverse effect" is unlawful under the APA because a "relevant factor" was not considered. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual,* 463 U.S. at 43, 103 S.Ct. 2856.[8]

A review of the record, however, demonstrates that plaintiffs' arguments were considered. While it did not specifically refer to plaintiffs' argument or to Bulletin No. 40, the Park Service found in its original determination that there was no adverse effect on the setting, feeling or association of Gettysburg or Eisenhower from the proposed deer management program. *See* Letter from John A. Latschar, Superintendent of Gettysburg National Military Park to Brenda Barrett, A.R. at 6317–19 ("Audible effects are temporary, limited, proportionally decreasing, and minimized by muzzle suppressors"). An evaluation of the setting, feeling or association of the parks necessarily would include an evaluation of the deer management program's effect on Gettysburg's "quiet contemplative atmosphere."

When the SHPO and the ACHP reviewed the determination of the Park Service, they received lengthy submissions from plaintiffs that fully discussed their argument and Bulletin No. 40. *See* Letter from Katherine Meyer to Dr. Brent D. Glass and Brenda Barrett, A.R. at 6363–70; Letter from Katherine Meyer to John Fowler, Executive Director of Historic Preservation, A.R. at 6380–6435. Each of the reviewers approved the finding of no adverse effect. While the decisions do not mention Bulletin No. 40, the reviewers did discuss National Register Bulletin No. 38, addressing the contention that Gettysburg is a "traditional cultural property." Viewed in context, this was merely a recharacterization of plaintiffs' argument rather than a neglect of it. *See* Letter from Donald Klima, Advisory Council on Historic Preservation to Carol Shull, Keeper of the National Register of Historic Places, A.R. at 6464–65 ("We note that the attributes cited [by plaintiffs' counsel] include values more often associated with traditional cultural properties, as opposed to other National Register properties, insofar as they depend, to a certain degree, upon the perceptions and beliefs of those who attribute sacred values to this property"); *see also* Letter from Carol D. Shull, Keeper of the National Register to Donald Klima, Advisory Council on Historic Preservation, A.R. 6506–07; Letter from Donald Klima, Advisory Council on Historic Preservation, to John A. Latschar, Superintendent of Gettysburg National Military Park, A.R. 6504–05. This recharacterization, coupled with the reviewers' concurrence with the Park Service finding of no "adverse effect" on Gettysburg's setting, feeling or association, suggests that the SHPO and the ACHP fully considered plaintiffs' submissions, including the argument under Bulletin No. 40. The Court

8. On this issue, the parties are like ships passing in the night. Nowhere in the arguments made by defendants before this Court do they even address Bulletin No. 40.

concludes that the Park Service complied with the APA by considering all relevant factors, including plaintiffs' arguments, in its review of the effects of the deer management program under the NHPA.

An Order consistent with this Opinion is entered this same day.

SO ORDERED.

### MEMORANDUM OPINION

On December 31, 1998, the Court granted summary judgment for defendants, allowing them to reinitiate their deer management program for Gettysburg National Military Park ("Gettysburg") and Eisenhower National Historic Site ("Eisenhower"). Four days later, on January 4, 1999, plaintiffs filed a motion to amend and reconsider the ruling under Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure, arguing (1) that the Court was mistaken when it stated that plaintiffs did not request a supplemental environmental impact statement ("supplemental EIS") before arguing in their summary judgment motion that one was required; and (2) that the administrative record did not support the Court's finding that the National Park Service ("Park Service") had considered plaintiffs' primary argument under the National Historic Preservation Act ("the NHPA"). Because the motion to amend and reconsider was not frivolous on its face, the Court once again stayed the deer management program and requested expedited briefing on plaintiffs' motion. *See* Order of January 5, 1999.

The circumstances under which this action arose were fully discussed in the Court's Opinion of December 31, 1998. Plaintiffs filed this lawsuit in February of 1997 to prevent the Park Service from continuing its deer management program for Gettysburg and Eisenhower. The program, which calls for park rangers to shoot deer in a controlled harvest to maintain the population density, was in effect in 1996 and 1997 but was suspended because of the pendency of this lawsuit. In their motion for summary judgment, plaintiffs

argued that the program violated the National Park Service Organic Act, 16 U.S.C. § 1 *et seq.*, the management policies implementing the Organic Act, the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the NHPA, 16 U.S.C. § 470 *et seq.* The Court entered judgment for defendants on all counts. *See* Order of December 31, 1998.

A motion to alter or amend a judgment under Rule 59(e) of the Federal Rules of Civil Procedure will not be granted unless there is an "intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C.Cir. 1996) (citing *National Trust v. Department of State*, 834 F.Supp. 453, 455 (D.D.C.1993), *aff'd in part and rev'd in part on other grounds sub nom. Sheridan Kalorama Historical Ass'n v. Christopher*, 49 F.3d 750 (D.C.Cir.1995)). A motion for relief under Rule 60(b) of the Federal Rules to remedy "mistake, inadvertence, surprise, or excusable neglect," *see* Rule 60(b), Fed.R.Civ.P., will not to be granted unless the movant can demonstrate a "meritorious claim or defense." *Lepkowski v. United States Dep't of the Treasury*, 804 F.2d 1310, 1314 (D.C.Cir.1986). Plaintiffs argue that the Court should amend and reconsider its Opinion and enter judgment for them because its Opinion contained "clear errors" and "mistakes" on two points.

First, plaintiffs contest the Court's statement that the Park Service was not required to address whether to prepare a supplemental EIS during the administrative process because "[i]t appears from the record ... that ... plaintiffs never requested a supplemental EIS or argued that one was required until they raised the issue in this Court." *Opinion of December 31, 1998 at 18 n. 7.* Plaintiffs point out that they did in fact raise the issue in their motion to amend their complaint and in a confidential settlement letter sent to de-

fendants—seen by the Court for the first time in connection with their motion for reconsideration. It follows from these facts, plaintiffs maintain, that the arguments of the Park Service could not be lawfully asserted for the first time in this litigation and are *post hoc* rationalizations that should be ignored by the Court.

Plaintiffs have not demonstrated that either the Court's statement in footnote 7 of its Opinion or its conclusion on the merits was in error. Despite their protests to the contrary, plaintiffs did not raise this argument during the administrative process, and it therefore is not reflected in the administrative record. The fact that they raised it in a settlement letter during the briefing of the summary judgment motions or in their motion to amend is irrelevant. The Court also is doubtful that the Administrative Procedure Act requires the Park Service to document its consideration of every possible "new circumstance" that could justify a supplemental EIS. *See* 40 C.F.R. § 1502.9(c). Finally, footnote 7 of the Court's Opinion was at most an alternative ground for the Court's conclusion that a supplemental EIS was not required in this case. The decision not to prepare a supplemental EIS was not arbitrary and capricious for the reasons stated in the text of the Court's Opinion. *See* Opinion of December 31, 1998 at 15–18.

Second, plaintiffs argue that the decision of the Park Service was arbitrary and capricious because the Park Service ignored plaintiffs' primary argument at every stage of the NHPA process and therefore failed to consider a "relevant factor" in making its decision. *See Motor Vehicle Manufacturers Ass'n v. State Farm Mutual,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("In reviewing [an agency's] explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment'") (citations omitted). Specifically, plaintiffs maintained during the re-

view process that the deer management program's effect on Gettysburg's "quiet contemplative atmosphere" was an adverse effect under the regulations of the Advisory Council on Historic Preservation. Plaintiffs based this argument on an excerpt from the National Register for Historic Places Bulletin on historic battlefields that described battlefields as "places of quiet contemplation." National Register for Historic Places Bulletin No. 40, Guidelines for Identifying, Evaluating, and Registering America's Historic Battlefields ("Bulletin No. 40"), Plaintiffs' Exhibit G at 3. In its Opinion, the Court concluded that although neither the Park Service nor the subsequent reviewers mentioned Bulletin No. 40 in their findings of "no adverse effect," plaintiffs' argument was fully considered because the Park Service and the reviewers had found that the program would not have an adverse effect on the feeling, setting and association of Gettysburg and Eisenhower and it therefore appeared that plaintiffs' argument simply had been "recharacterized" as an argument that Gettysburg was a "traditional cultural property." *See* Opinion of December 31, 1998 at 20–21.

In their motion for reconsideration, plaintiffs argue that the record demonstrates that the Park Service explicitly addressed and summarily rejected plaintiffs' argument in its initial finding of "no adverse effect," ensuring that the argument would be ignored at every subsequent step of the review process. In particular, plaintiffs quote the statements of the Park Service that its "obligation under the provisions of the National Historic Preservation Act, as amended, is to preserve those qualities which make the park eligible to [sic] the National Register of Historic Places" and that "[t]hose qualities do not include a 'contemplative' atmosphere." Section 106 Case Report; White–Tailed Deer Management at 9, Administrative Record ("A.R.") at 6360. As a result, plaintiffs reassert their argument that the import of Bulletin No. 40 was a

"relevant" factor that was never considered during the NHPA process.

The language now cited by plaintiffs indicates that the Park Service gave their argument more consideration than was suggested in the Court's earlier Opinion. According to plaintiffs, after considering the general effect of the deer management program on the parks, the Park Service explicitly considered whether the program's effect on Gettysburg's "quiet contemplative atmosphere" was an effect that it should consider under the NHPA. *See* Section 106 Case Report; White–Tailed Deer Management at 9, A.R. at 6360. The Park Service found that the "quiet contemplative atmosphere" was not a quality that might make Gettysburg eligible for the National Register of Historic Places and therefore was not a quality to be considered under the NHPA. *Id.* It therefore is apparent that the Park Service considered plaintiffs' argument in its initial finding of "no adverse effect." [1]

Plaintiffs also maintain, however, that because their argument under Bulletin No. 40 was summarily rejected by the Park Service, it was never addressed in the review of the Park Service determination by the State Historic Preservation Officer ("SHPO") or the Advisory Council on Historic Preservation ("ACHP"). *See* 36 C.F.R. § 800.5. These reviewers, however, were privy to both plaintiffs' argument and the Park Service evaluation of that argument when they made their findings. Their concurrence therefore is properly seen as an endorsement of the rejection of plaintiffs' argument by the Park Service.

█ Finally, even if the SHPO and the ACHP were required explicitly to discuss all "relevant factors" in their approval of the finding of the Park Service of "no adverse effect," the Court concludes that plaintiffs' Bulletin No. 40 argument was not a "relevant factor." The regulations of the Advisory Council on Historic Preservation require the Park Service to consider the "alteration of the character of the property's setting when that character contributes to the property's qualification for the National Register." 36 C.F.R. § 800.9(b)(2). Plaintiffs' contention that Gettysburg's "quiet contemplative atmosphere" is a quality that makes it eligible for the National Register of Historic Places derives from the general discussion of the attributes of battlefields in Bulletin No. 40. *See* Bulletin No. 40 at 3. Later in the document, however, Bulletin No. 40 expressly adopts the standard criteria for evaluating eligibility for the National Register for Historic Places. *See* Bulletin No. 40 at 9 ("To qualify for the National Register a property must meet one or more of the [four] National Register Criteria for Evaluation").[2] Gettysburg's "quiet contemplative atmosphere" is not included among the listed criteria and therefore is not a quality contributing to its qualification for the National Register. It simply is not a "relevant factor" that the Park Service was required to consider. Plaintiffs' motion to amend and reconsider will be denied.

An Order consistent with this Opinion is entered this same day.

SO ORDERED.

---

1. It also is noteworthy that the Park Service discussed whether Gettysburg might be a "traditional cultural property" in the subsequent paragraph of the Case Report, suggesting the "recharacterization" of plaintiffs' argument by the Park Service that the Court found in its original Opinion. *See* Section 106 Case Report; White–Tailed Deer Management at 9, A.R. at 6360.

2. These criteria are (1) whether the site "may be associated with events ... that have made a significant contribution to the broad patterns of our history," (2) whether the site "may be associated with the lives of individuals significant in our past," (3) whether the site "may contain significant works of architecture or engineering" and (4) whether the site "may have yielded, or may be likely to yield, information important in our history." Bulletin No. 40 at 9.