United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued November 9, 1999 Decided February 22, 2000 

 No. 99-5037

 Paul Davis III, et al., 
 Appellants

 v.

 John Latschar, Superintendent, Gettysburg National
 Military Park, et al., 
 Appellees

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 97cv00232)

 Katherine A. Meyer, with whom Howard M. Crystal was 
on the briefs, argued the cause for appellants.

 Evelyn S. Ying, Attorney, U.S. Department of Justice, with 
whom Lois J. Schiffer, Assistant Attorney General, and Rob-
ert L. Klarquist, Attorney, U.S. Department of Justice, were 
on the brief, argued the cause for appellees.

 Before Ginsburg and Garland, Circuit Judges, and 
Buckley, Senior Circuit Judge.

 Opinion for the court filed by Senior Judge Buckley.

 Buckley, Senior Judge: In 1995, John Latschar, the Su-
perintendent of Gettysburg National Military Park ("Gettys-
burg"), instituted a program to curtail the over-browsing of 
wooded and crop areas by white-tailed deer in Gettysburg 
and the neighboring Eisenhower National Historic Site. The 
program provides for the annual killing of deer by park-
employed marksmen after dark from October through March 
until a desired density of deer per wooded square mile is 
achieved. Paul Davis III, five other residents of Gettysburg, 
Pennsylvania, and three animal rights organizations (collec-
tively, "Davis") seek an order enjoining the program on the 
basis that, in approving it, the National Park Service had 
failed to comply with its own enabling statute and policies 
implementing that statute, the National Environmental Policy 
Act, and the National Historic Preservation Act.

 On December 31, 1998, the district court issued an opinion 
in which it granted summary judgment in favor of the Super-
intendent, the Director of the National Park Service, and the 
Secretary of the Interior, all of whom were joined as parties 
defendant (collectively, "Superintendent"). See Davis v. 
Latschar, __ F. Supp.2d ___ (D.D.C. 2000), No. 97-232, 1998 
WL 968474, at *1 (D.D.C. Dec. 31, 1998) ("1998 opinion"). 
Davis thereupon filed a motion requesting the court to amend 
the opinion "to correct ... the Court's characterization of 
the record in the case." Motion to Amend and Reconsider 
the Court's Ruling ("motion to amend"), reprinted in Joint 
Appendix ("J.A.") at 920. In a memorandum opinion and 
order issued on January 26, 1999, the court denied the 
motion, again entered judgment for the defendants, and lifted 
the stay that had caused the Park Service to suspend its 
implementation of the deer management program. See Davis 
v. Latschar, __ F. Supp.2d ___, ___ (D.D.C. 2000), No. 97-232, 
1998 WL 968474, at *10 (D.D.C. Jan. 26, 1999) ("mem. op.").

 We affirm the district court's summary judgment in favor 
of the Superintendent for the reasons stated in the 1998 
opinion, which we adopt as our own and reprint as an 

appendix hereto. To District Judge Paul L. Friedman's 
thorough and well-reasoned analysis, we would add only the 
following comments concerning two issues raised by Davis in 
his motion to amend and before this court in which he claims 
that the 1998 opinion mischaracterizes the record. The first 
of these relates to Davis's argument that the Park Service 
was required by the National Environmental Policy Act to 
prepare a supplemental environmental impact statement 
("SEIS") for the deer management program to take into 
account changes in park management recommended in a 
newly proposed "General Management Plan" ("GMP") that 
has since been adopted by the Park Service. These called for 
significant reductions in wooded acreage and for changes in 
agricultural patterns at Gettysburg that the Park Service 
acknowledged would result in a reduction in the park's deer 
population. The second relates to Davis's argument that the 
Park Service failed to address the impact of the deer manage-
ment program on the contemplative atmosphere of Gettys-
burg as he alleges it was required to do under the National 
Historic Preservation Act.

A. National Environmental Policy Act

 In the memorandum Davis submitted in support of the 
motion to amend ("Davis memorandum"), reprinted in J.A. at 
922-30, he complained that the 1998 opinion's discussion of 
the SEIS issue contained a misleading footnote and improper-
ly relied on an argument the Park Service's counsel made for 
the first time before the district court. See, e.g., SEC v. 
Chenery Corp., 332 U.S. 194, 196 (1947) ("[A] reviewing court, 
in dealing with a determination or judgment which an admin-
istrative agency alone is authorized to make, must judge the 
propriety of such action solely by the grounds invoked by the 
agency."). The footnote complained of states that "[it] ap-
pears from the record ... that ... plaintiffs never request-
ed a supplemental EIS or argued that one was required until 
they raised the issue in this Court." Davis, ___ F. Supp.2d at 
___ n.7, 1998 WL 968474, at *8 n.7; Appendix at 15-16 n.7. 
In support of his motion to amend, Davis submitted, as new 
evidence suggesting that he had, in fact, raised the issue 
before the Park Service, a copy of a letter proposing a 

settlement of the case in which he urged the Service to 
initiate an SEIS. If the court's failure to take cognizance of 
facts not presented to it was indeed error, in this case it was 
harmless error. As Judge Friedman correctly noted in dis-
missing the motion to amend, the footnote "was at most an 
alternative ground for the Court's conclusion that a supple-
mental EIS was not required in this case." Mem. op. at 3.

 The Park Service argument to which Davis objected, and 
on which the district court relied, is to be found in the last 
sentence of the following excerpt from the 1998 opinion:

 Plaintiffs argue that [the removal of several hundred 
 acres of non-historic woodlands and changes in agricul-
 tural patterns] will lead to a reduction in the deer 
 population. Once again, plaintiffs have improperly fo-
 cused the inquiry. The deer management program is 
 intended to maintain the deer population density, not the 
 total deer population.
 
Davis, ___ F. Supp.2d at ___, 1998 WL 968474, at *8 (empha-
sis in original); Appendix at 14.

 Davis describes the distinction between deer population 
(i.e., the total number of deer within Gettysburg) and deer 
density (which is measured in terms of the number of deer 
per wooded square mile within the park) as a post hoc 
rationalization. Davis is mistaken. The deer management 
program is itself predicated on the need to control density. 
See, e.g., Final Environmental Impact Statement, Appendix E 
at 152 ("The National Park Service has decided the initial 
April deer density goal will be 25 deer per square mile of 
forested study area....").

 It is worth noting that because the program is based on 
density rather than population, it is remarkably sensitive to 
the kinds of changes in the Gettysburg landscape that are 
called for in the GMP. The Park Service recognizes that 
"[t]he precise density of deer that would result in an accept-
able level of browsing that would allow Gettysburg [National 
Military Park] and Eisenhower [National Historic Site] to 
meet their landscape management objectives is unknown." 

Id. at 151. Because of uncertainty regarding the optimal 
density level, the Park Service erred on the side of preserving 
deer by setting an initial goal that is less stringent than the 
20 deer per square mile supported by the Park Service's own 
research and recommended by the Pennsylvania Game Com-
mission for the county in which the parks are located. The 
program calls for ongoing monitoring of the effects of deer 
browsing on cropfields and woodlots so that the deer density 
goal may be adjusted in light of actual experience in meeting 
the parks' landscape objectives. Id. at 152-53.

B. National Historic Preservation Act

 Davis maintains that the Park Service violated the National 
Historic Preservation Act ("NHPA") because, in assessing the 
impact of the nightly killing of deer on the parks, it ignored 
what he believed to be its obligation to protect the "contemp-
lative" atmosphere of the Gettysburg battlefield. Davis mem-
orandum at 5-6. The record, however, confirms that the 
Park Service gave the substance of his argument full consid-
eration. See, e.g., Section 106 Case Report at 9 (discussing 
claim that deer management program would adversely affect 
the " 'solemn and contemplative purpose' of the park"); Let-
ter from Superintendent Latschar to Brenda Barnett (Aug. 
19, 1997) ("Audible effects are temporary, limited, proportion-
ally decreasing, and minimized by muzzle suppressors."). 
Furthermore, the Park Service provided Davis's position and 
its own evaluation of it to the Pennsylvania Historical and 
Museum Commission and the Advisory Council on Historic 
Preservation, with whom it was required to consult. See 36 
C.F.R. ss 800.2(b)(2), (c) (1999). Each of these bodies agreed 
that the program would have no adverse effect on the quali-
ties that make Gettysburg eligible for inclusion in the Nation-
al Register of Historic Places.

 In light of the foregoing, the district court's order denying 
the motion to amend and entering judgment for the Superin-
tendent is

 Affirmed.

 

 APPENDIX

 Paul DAVIS III, et al., Plaintiffs
 v.
 John LATSCHAR, et al., Defendants

 OPINION

 Dec. 31, 1998

 FRIEDMAN, District Judge.

 The National Park Service (the "Park Service") seeks to 
reinitiate its deer management program for Gettysburg Na-
tional Military Park ("Gettysburg") and Eisenhower National 
Historic Site ("Eisenhower"). The program, which calls for 
park rangers to shoot deer in a controlled harvest to maintain 
the population density, was in effect in 1996 and 1997. The 
Park Service suspended the program in July of 1997 because 
of the pendency of this lawsuit and stipulated that it would 
not reinitiate the program without an Order from this Court. 
It has now requested such an Order.

 Plaintiffs argue that the Court should enjoin the deer 
management program because the Park Service has acted 
contrary to (1) the National Park Service Organic Act ("Or-
ganic Act"), 16 U.S.C. s 1 et seq., (2) its management policies 
implementing the Organic Act, (3) the National Environmen-
tal Policy Act ("NEPA"), 42 U.S.C. s 4321 et seq., and (4) the 
National Historic Preservation Act ("NHPA"), 16 U.S.C. 
s 470 et seq. Because the Court finds that the Park Service 
acted consistently with the Organic Act and its implementing 
guidelines and that it has complied with the procedures of 
both NEPA and NHPA, the Court grants summary judgment 
for the Park Service which therefore is permitted to reinitiate 
its deer management program.

 I. BACKGROUND
 Gettysburg and Eisenhower are contiguous parcels of land 
in rural Pennsylvania that are managed by the National Park 
Service. Gettysburg was established to "preserve and pro-
tect the resources associated with the Battle of Gettysburg 
and the Soldiers' National Cemetery, and to provide under-
standing of the events that occurred [there], within the 
context of American history." See Draft General Manage-

ment Plan and Environmental Impact Statement for Gettys-
burg National Military Park ("Draft GMP"), Plaintiffs' Exh. 
E at 7; see also An Act to Establish a National Military Park 
at Gettysburg, Pennsylvania, s 3, 28 Stat. 651 (1895) (codified 
as amended at 16 U.S.C. s 430g) (The Superintendent of the 
park shall "ascertain and definitely mark the lines of battle of 
all troops engaged in the battle of Gettysburg"). Eisenhower 
was established to preserve the cultural and natural resources 
of the home of President Dwight D. Eisenhower and to 
interpret his life and career. See Final Environmental Im-
pact Statement for the White-Tailed Deer Management Plan 
("Final EIS") at 3-5, Administrative Record ("A.R.") at 2200-
02.

 By the early 1980's, the Park Service had become con-
cerned about deer overpopulation in the area of Gettysburg 
and Eisenhower. In 1985, at the request of the Park Service, 
Dr. Gerald Storm of Pennsylvania State University and his 
colleagues began a study of the impact of the deer on the 
parks "because of concern by the National Park Service 
resource managers about the intensive deer browsing of tree 
seedlings in historic woodlots, increasing consumption of farm 
crops by deer, and high number of deer and automobile 
collisions." Gerald L. Storm et al., Executive Summary of 
Population Status, Movements, Habitat Use, and Impact of 
White-Tailed Deer ("Storm Report") at 1, A.R. at 207. Cor-
roborating the concerns of the resource managers, Dr. Storm 
found that the browsing of the deer depleted the oak and 
white ash seedlings needed to maintain the woodlots' historic 
appearance and that the deer consumed a large percentage of 
the corn and wheat crop. Id. at 3-4, A.R. at 209-10. Dr. 
Storm recommended that the Park Service reduce the deer 
population density to a level "at or below the level recom-
mended for Adams County by the Pennsylvania Game Com-
mission." Id. at 4, A.R. at 210. This level was 20 deer per 
forested square mile. Id.

 Even before the Storm Report was completed, the Park 
Service had begun to evaluate alternatives for controlling 
deer population density. In February of 1990, Dr. Gerald 
Wright of the University of Idaho sent a 100-page draft 

environmental impact statement ("EIS") to the Park Service 
that recommended fencing off the protected areas as the 
preferred approach. See R. Gerald Wright, Deer Manage-
ment Alternatives for Gettysburg National Military Park and 
Associated Environmental Analysis; A Draft Report (1990), 
A.R. at 3944-4054. While Dr. Wright's report received some 
initial favorable reviews, it was subsequently rejected as 
substantively and procedurally inadequate and therefore was 
used only as a research document. See May 7, 1990 Memo-
randum from Jacob J. Hoogland, Chief, Environmental Quali-
ty Division, to Bob Gift, Regional Director, Mid-Atlantic 
Region, A.R. at 354 ("The draft environmental analysis that 
we have reviewed informally has neither the substance nor 
format necessary to suffice as an EIS").

 In August of 1992, the Park Service published its Notice of 
Intent to Prepare a Draft Environmental Impact Statement 
in the Federal Register; the notice described a range of 
alternatives that might be used to control deer population 
density. See 57 Fed.Reg. 3806 (1992), A.R. at 984. The Park 
Service noticed and held two open meetings to gather infor-
mation from the public on the desired scope of the EIS. See 
Minutes of the January 7 Meeting on White-tailed Deer 
Management at Gettysburg National Military Park/Eisen-
hower National Military Site Held at Penn State, A.R. at 
1111-15; Environmental Impact Statement Meeting, Febru-
ary 27th, 1993, A.R. at 1169-75. In both the draft environ-
mental impact statement that it released in 1994 and the final 
environmental impact statement it released in 1995, the Park 
Service explicitly considered a range of alternatives, including 
the fencing alternative proposed by Dr. Wright and endorsed 
by plaintiffs in this litigation. See Draft Environmental 
Impact Statement for the White-Tailed Deer Management 
Plan ("Draft EIS") at 24-42, A.R. at 1888-1906; Final EIS at 
24-42, A.R. at 2221-41.1 The Park Service then published its 

__________
 1. The Park Service created a list of alternatives using sugges-
tions from the public and Park Service personnel and by reviewing 
the available literature. See Final EIS at 23, A.R. at 2220. The 
Park Service eliminated nine alternatives from detailed study after 

Record of Decision ("ROD"), choosing to manage the popula-
tion density through a controlled harvest (i.e., shooting the 
deer to reduce their density), and began the hunt in the fall of 
1996. Record of Decision ("ROD"), A.R. at 3570-76.

 Plaintiffs brought suit in February of 1997 to enjoin the 
shooting of the deer. After briefing had begun on plaintiffs' 
motion for summary judgment, the Park Service moved to 
stay the litigation, arguing that it would eliminate the issues 
in the lawsuit by suspending the deer management program 
while revisiting its compliance with the applicable laws. See 
Defendants' July 25, 1997 Motion for Temporary Stay of 
Litigation at 1-2. The Park Service also revealed that soon 
after plaintiffs filed their complaint it had initiated procedures 
to comply with the National Historic Preservation Act. See 
Transcript of August 12, 1997 Motions Hearing at 7-8. After 
the parties agreed that the deer management program would 
not be reinitiated without an Order from this Court and 
formulated procedures to ensure plaintiffs' involvement in the 
NHPA process, the Court stayed the litigation. See August 
15, 1997 Joint Stipulation.

 The Park Service now has conducted what it believes to be 
a sufficient NHPA process. It has prepared a Section 106 
report analyzing the possible "adverse effects" of the deer 
management program on Gettysburg and Eisenhower, includ-
ing its effect upon "location, design, setting, materials, work-
manship, feeling [and] association," 36 C.F.R. s 800.9(b), and 
it has concluded that the program would have no "adverse 
effects." See Section 106 Case Report; White-Tailed Deer 

__________
initial consideration. These alternatives were: (1) restoration of 
predators, (2) deterrents, (3) repellants, (4) poison, (5) public hunt-
ing, (6) fencing, (7) conversion of cropfields to pasture or hay and 
grasses, (8) deer as a commodity, and (9) landowner privilege. Id. 
at 24-30, A.R. at 2221-27. The Park Service then evaluated the 
five alternatives it considered most viable in more detail. The 
second group of alternatives were: (1) no action, (2A) capture and 
transfer, (2B) direct reduction (shooting the deer), (3) reproductive 
intervention (contraception), (4) cooperative management with 
Pennsylvania authorities, and (5) combined management (a combi-
nation of 2B and 4). Id. at 30-42, A .R. at 2227-41.

Management, A.R. at 6352-62. The Park Service then sought 
the concurrence of the State Historic Preservation Officer 
("SHPO") and, pursuant to the parties' joint stipulation, 
allowed the plaintiffs to submit their own materials. See 
Letter from Dr. John A. Latschar, Superintendent of Gettys-
burg National Military Park to Brenda Barrett, Director, 
Pennsylvania Bureau of Historic Preservation, A.R. at 6349-
51; Letter from Katherine Meyer to Dr. Brent D. Glass and 
Brenda Barrett, A.R. at 6363-70. The SHPO agreed with the 
Park Service that there would be no "adverse effects." See 
Letter from Brenda Barrett to Dr. John A. Latschar, Super-
intendent of Gettysburg National Military Park, A.R. at 6371. 
The same process was used to seek the approval of the 
Advisory Council on Historic Preservation ("ACHP"). After 
obtaining the views of the Keeper of the National Register on 
plaintiffs' arguments, the ACHP also agreed with the finding 
of "no adverse effect." See Letter from Don L. Klima, 
Advisory Council on Historic Preservation to Dr. John A. 
Latschar, Superintendent of Gettysburg National Military 
Park, A.R. at 6504-06.2

 On June 19, 1998, the Park Service declared its intent to 
reinitiate the deer management program. In August of 1998, 
the Park Service released a new draft General Management 
Plan ("draft management plan" or "Draft GMP") for Gettys-
burg. Based on new research on the Battle of Gettysburg 
and its relationship to Gettysburg's terrain, the draft manage-
ment plan recommended adjusting the landscape to better 
reflect its state at the time of the battle. See Draft General 
Management Plan and Environmental Impact Statement for 
Gettysburg National Military Park ("Draft GMP"), Plaintiffs' 
Exh. E at 59-60. In the draft management plan's preferred 
alternative, the Park Service proposed cutting 576 acres of 
non-historic woodlands, altering 278 acres of non-historic 
woodlands to reflect historic woodlots and shifting the agri-

__________
 2. The ACHP consulted with the Keeper of the National Regis-
ter regarding what traits Gettysburg possessed that would qualify it 
for the National Register. See Letter from Donald Klima, Advisory 
Council on Historic Preservation to Carol Shull, Keeper of the 
National Register of Historic Places, A.R. at 6464-65.

culture to historical field patterns. See id. at 122-28. All 
proposals considered under the draft management plan were 
premised on achieving a deer density goal of 25 deer per 
forested square mile, as well as the objective of maintaining 
the historic woodlots and croplands. See id. at 74-75, 108-64.

 II. DISCUSSION

 A. Standard of Review

 The Court may set aside the decision of the Park Service to 
reinitiate the deer management program only if that decision 
was arbitrary and capricious, not in accordance with the law 
or unwarranted by the facts. 5 U.S.C. s 706(2)(A). For 
challenges to an agency's construction of the statutes or 
regulations that it administers--such as the Park Service's 
reading of its Organic Act and management policies--the 
Court's review must be particularly deferential. The Court 
must defer to the agency's interpretation of a statute that it 
implements "so long as it is reasonable, consistent with the 
statutory purpose, and not in conflict with the statute's plain 
language." OSG Bulk Ships, Inc. v. United States, 132 F.3d 
808, 814 (D.C.Cir.1998) (quoting Coal Employment Project v. 
Dole, 889 F.2d 1127, 1131 (D.C.Cir.1989)); see Chevron 
U.S.A., Inc. v. Natural Resources Defense Council. 467 U.S. 
837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Similarly, 
provided it does not violate the Constitution or a federal 
statute, an agency's interpretation of its own regulations "will 
prevail unless it is 'plainly erroneous or inconsistent' with the 
plain terms of the disputed regulations." Everett v. United 
States, 158 F.3d 1364, 1367 (D.C.Cir.1998) (quoting Auer v. 
Robbins, 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)); 
see Stinson v. United States, 508 U.S. 36, 45, 113 S.Ct. 1913, 
123 L.Ed.2d 598 (1993); Amerada Hess Pipeline Corp. v. 
FERC, 117 F.3d 596, 600 (D.C.Cir.1997).

 The standard of review for agency decisions is highly 
deferential:

 [T]he Court must consider whether the decision was based 
 on a consideration of the relevant factors and whether 
 there has been a clear error of judgment. Although this 
 
 inquiry into the facts is to be searching and careful, the 
 ultimate standard of review is a narrow one. The Court is 
 not empowered to substitute its judgment for that of the 
 agency.
 
Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 
402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); see Motor 
Vehicles Manufacturers Ass'n v. State Farm Mutual Auto-
mobile Insurance Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 
L.Ed.2d 443 (1983). The Court's "task is to determine 
'whether the agency's decisionmaking was reasoned,' ... i.e., 
whether it considered relevant factors and explained the facts 
and policy concerns on which it relied, and whether those 
facts have some basis in the record." National Treasury 
Employees Union v. Horner, 854 F.2d 490, 498 (D.C.Cir.1988) 
(quoting American Horse Protection Ass'n. Inc. v. Lyng, 812 
F.2d 1, 5 (D.C.Cir.1987)).

 B. The National Park Service Organic Act and Policies

 Under the National Park Service Organic Act, the Secre-
tary of the Interior "may ... provide in his discretion for the 
destruction of such animals and of such plant life as may be 
detrimental to the use of any said parks, monuments, or 
reservations." 16 U.S.C. s 3. Because the Organic Act is 
silent as to the specifics of park management, the Secretary 
has especially broad discretion on how to implement his 
statutory mandate. See Daingerfield Island Protective Soc'y 
v. Babbitt, 40 F.3d 442, 446 (D.C.Cir.1994); see also Bicycle 
Trails Council v. Babbitt, 82 F.3d 1445, 1454 (9th Cir.1996) 
(adopting the district court's opinion); Intertribal Bison 
Coop. v. Babbitt, 25 F.Supp.2d 1135 (D.Mont. 1998). Still, a 
"finding of detriment" is necessary before the Park Service 
may engage in a "controlled harvest" such as the one pro-
posed by the Park Service in its deer management program. 
Intertribal Bison Coop. v. Babbitt, at 1138 ("pursuant to s 3 
of the Organic Act and Park Service policy a finding of 
detriment is necessary to justify a controlled harvest, ... but 
an explicit finding of detriment is not otherwise necessary to 
justify the destruction of wildlife ...."); see also General 

Regulations for Areas Administered by National Park Ser-
vice, 48 Fed.Reg. 30,252, 30,264 (1983) (controlled harvest 
"will be utilized only when a finding of 'detriment,' based on 
scientific documentation, has been made by the superinten-
dent, and it is determined that removal is an acceptable 
method of resource management").

 The Park Service claims that it made a sufficient "finding 
of detriment" to justify the destruction of the deer under the 
Organic Act when it concluded that overbrowsing by deer in 
the historic woodlots and cropfields was detrimental to the 
purposes of the parks.3 As is reflected at several points in 
the record, the Park Service determined that the overbrows-
ing was preventing it from achieving the parks' objectives of 
preserving the historic appearance of the woodlots and crop-
fields, components of the landscape critical to the understand-
ing and interpretation of the historic events that took place in 
each park. See, e.g., ROD at 2, A.R. at 3571 ("Management 
objectives for maintaining landscape components, specifically 
historic woodlots and cropfields, were developed to enhance 
visitor understanding of each park's events"). For example, 
in its Record of Decision initiating the deer management 
program, the Park Service concluded that

 [d]ata from the [Storm Report] showed that the woodlots 
 and cropfields could not be maintained in a way necessary 
 to achieve park objectives. The high level of deer browsing 
 was preventing a sufficient number of tree seedlings from 
 becoming established, which is needed to perpetuate the 
 historic woodlots. The agricultural program was unable to 
 grow historical crops to maturity in Eisenhower NHS and 
 
__________
 3. Despite plaintiffs' contentions that the Park Service was 
acting in the economic interests of certain tenant farmers in making 
this determination, the Court concludes that the record does not 
demonstrate that the Park Service had any such ulterior motive. It 
was not unreasonable for the Park Service to have kept the farmers 
informed about efforts to control the deer and to respond to their 
concerns in writing.

 the southern part of Gettysburg NMP due to deer brows-
 ing.
 
Id. at 3, A.R. at 3572. The Court concludes that Park Service 
made a sufficient "finding of detriment" on the record to 
satisfy the requirements of the Organic Act.

 Plaintiffs contend, however, that the "finding of detriment" 
made by Park Service is arbitrary and capricious because it is 
inconsistent with the alleged admission by the Park Service in 
its draft management plan that the cropfields and woodlots do 
not need protection because they do not reflect the historic 
landscape. Contrary to plaintiffs' assertion, the draft man-
agement plan contains no such admission. The plan proposes 
to eliminate only non-historic woodlands. See Draft GMP at 
122. The perpetuation of the historic woodlots and croplands 
is still necessary to achieve park objectives under the draft 
management plan. Nothing in the record suggests that the 
threats to these historic resources from deer overbrowsing--
i.e., the suppression of oak and white ash seedlings and 
excessive crop loss--are any less likely to occur in the new 
management regime than at the time the Park Service issued 
its decision to institute the deer management program. The 
"finding of detriment" by the Park Service therefore is not 
undermined by the draft management plan and may still 
justify the "destruction" of deer under the Organic Act.

 If the Organic Act were the only authority limiting the 
management discretion of the Park Service, the analysis 
would end here. But the Park Service has further bound its 
own discretion through the adoption of Management Policies.4 
The Management Policies provide that

__________
 4. Whether the Park Service is bound by its Management 
Policies turns on "the agency's intent to be bound." Vietnam 
Veterans of America v. Secretary of the Navy, 843 F.2d 528, 538 
(D.C.Cir.1988). Plaintiffs contend that the Park Service demon-
strated the requisite intent in the Forward to policies when it stated 
that "[a]dherence to policy will be mandatory unless waived or 
modified by an appropriate authority." National Park Service 
Management Policies, Plaintiffs' Exhibit I at ix. Since defendants' 

 [u]nnatural concentrations of native species caused by hu-
 man activities may be controlled if the activities causing the 
 concentrations cannot be controlled.... Animal popula-
 tions or individuals will be controlled ... in cultural or 
 development zones when necessary to protect property or 
 landscaped areas.
 
National Park Service Management Policies ("Park Service 
Management Policies"), Plaintiffs' Exhibit I at 4:6. Plaintiffs 
argue that the Park Service has violated these policies be-
cause it has opted to control the deer overpopulation without 
first exhausting the available means to regulate the human 
activities causing the overpopulation. In particular, plaintiffs 
again point to the draft management plan as evidence that 
the deer population could be reduced by controlling "human 
activities" such as the decisions of the Park Service regarding 
the maintenance of Gettysburg's woodlands and cropfields.

 The Park Service asserts that the Court does not need to 
reach the merits of plaintiffs' argument because plaintiffs 
have misread the Management Policies. The Park Service 
maintains that the statement that "[a]nimal populations ... 
will be controlled in cultural ... zones when necessary to 
protect property or landscaped areas" is meant as an excep-
tion to the preceding sentence requiring that the Park Ser-
vice attempt first to control human activities before looking to 
control the animal populations. As a result, the Park Service 
argues that once it found that Gettysburg and Eisenhower 
were "cultural zones" with landscaped areas in need of pro-
tection, it was entitled to control the deer population directly 
without first seeking to control human activities.5

 While the language of the Management Policies could be 
interpreted either as plaintiffs read it or as the Park Service 
does, the interpretation of the Park Service is plausible; it 

__________
did not challenge this assertion, the Court finds that the Park 
Service intended to be bound and is bound by the policies.

 5. Plaintiffs do not contest the Park Service's position that 
Gettysburg and Eisenhower are cultural zones and that their land-
scaped areas need protection.

certainly is not "plainly erroneous or inconsistent" with the 
policies and therefore must prevail over plaintiffs' reading. 
See Everett v. United States, 158 F.2d at 1367. The first 
excerpted sentence describes two alternatives for addressing 
overpopulation of native species--control of the animal popu-
lation and control of the human activities that caused the 
"unnatural concentrations" or overpopulation--and announces 
a preference for the latter. The second excerpted sentence 
discusses only one of these two alternatives--control of the 
animal population--in the context of cultural or development 
zones. When these two sentences are juxtaposed, the read-
ing of the second sentence as an exception to the first 
sentence's preference for the control of human activities is 
not unreasonable. If the Park Service intended to express a 
preference for the control of human activities when address-
ing overpopulation in cultural or development zones, it is 
reasonable to expect that it would have explicitly discussed 
this alternative technique in the second sentence, as it had in 
the first. It did not do so. The interpretation of the Man-
agement Policies proffered by the Park Service is not "plainly 
erroneous or inconsistent" with the plain terms of the policies 
and therefore is entitled to deference.

 B. NEPA

 Plaintiffs challenge the deer management program under 
NEPA on two grounds. First, they argue that the Park 
Service did not consider many reasonable alternatives in its 
final EIS. Second, they argue that the Park Service must 
prepare a supplemental EIS as a result of the changes in 
park management that are considered in the draft manage-
ment plan. Because the Court finds that the Park Service 
considered a full range of reasonable alternatives and was 
within its discretion by opting not to prepare a supplemental 
EIS, the Court concludes that the Park Service fully complied 
with NEPA's procedural requirements.

 1. Reasonable Alternatives

 The regulations implementing NEPA require an agency to 
"specify the underlying purpose and need to which the agency 

is responding" and to "[r]igorously explore and objectively 
evaluate all reasonable alternatives, and for alternatives 
which were eliminated from detailed study, briefly discuss the 
reasons for their having been eliminated." 40 C.F.R. 
ss 1502.13, 1502.14. The courts have recognized that these 
requirements are interrelated because "the goals of an action 
delimit the universe of the action's reasonable alternatives." 
City of Burlington v. Busey, 938 F.2d 190, 195 (D.C.Cir.1991). 
The setting of the objectives and the range of alternatives to 
be considered by an agency are governed by a "rule of 
reason." See City of Grapevine v. U.S. Dept. of Transp., 17 
F.3d 1502, 1506 (D.C.Cir.1994); City of Burlington v. Busey, 
938 F.2d at 195. The Court must uphold "an agency's 
definition of objectives so long as the objectives that the 
agency chooses are reasonable, and ... uphold its discussion 
of alternatives so long as the alternatives are reasonable and 
the agency discusses them in reasonable detail." City of 
Burlington v. Busey, 938 F.2d at 196.

 Plaintiffs assert that the Park Service unfairly narrowed its 
objective for the deer management program from the perpet-
uation of historic resources to the control of deer population 
so as to eliminate reasonable alternatives. This argument is 
not supported in the record. In an internal memorandum 
drafted early in the NEPA process, the Park Service asserted 
that the objective of the program was "not to reduce the deer 
population but to perpetuate the significant elements of the 
cultural landscape." Program Review and Project Data 
Sheet for Deer Management at GETT, A.R. at 168. In the 
Final EIS, the Park Service stated that "a management 
action is needed to control the browsing effects of white-tailed 
deer in the parks." Final EIS at 13, A.R. at 2210. In the 
context of the Storm Report's conclusion that the overbrows-
ing of the deer was threatening the historic resources of 
Gettysburg, see Storm Report at 4, A.R. at 220, these state-
ments of objective are the same.

 Even if the Park Service's alteration of the objective's 
wording were suspicious, any suspicions are allayed by its 
thorough consideration of all alternatives. In its draft EIS 
and its final EIS, the Park Service initially considered and 

rejected a wide range of non-lethal alternatives, including 
alternatives such as fencing and altering cropfield patterns as 
suggested by plaintiffs. See Draft EIS, A.R. at 1892; Final 
EIS, A.R. at 2225-26. The Park Service then proceeded to 
evaluate in more detail the five alternatives it considered 
most viable. See Final EIS at 30-42, A.R. at 2227-41; see 
also supra at note 1. It is apparent from a review of both the 
draft EIS and the final EIS that the Park Service weighed all 
of the reasonable alternatives and came to a fully-informed 
decision. This is all that NEPA requires. See Strycker's 
Bay Neighborhood Council v. Karlen, 444 U.S. 223, 227-28, 
100 S.Ct. 497, 62 L.Ed.2d 433 (1980) (NEPA is only procedur-
al and does not mandate a substantive result); Environmen-
tal Defense Fund v. Massey, 986 F.2d 528, 532 (D.C.Cir.1993) 
(NEPA "does not dictate agency policy or determine the fate 
of contemplated action").

 Plaintiffs raise only one alternative not considered in the 
Final EIS--the cutting of the non-historic woodlands pursu-
ant to the draft management plan. This cannot be viewed as 
a "reasonable alternative," however, because it would not 
further the objective of reducing browsing in historic areas. 
As the draft management plan noted, the cutting of the non-
historic woodlands would not reduce the desired deer popula-
tion density. See Draft GMP at 255. Since it is deer 
population density that needs to be controlled in order to 
preserve the parks' historic resources, cutting the non-
historic woodlands would not further the deer management 
program's objective. Furthermore, the record suggests that 
cutting non-historic woodlands may even exacerbate the prob-
lem by driving the deer into the historic areas. See Storm 
Report at 5, A.R. at 211 (deer displaced by fencing "would be 
forced into other areas where their impact would be intensi-
fied"). Cutting the non-historic woodlands therefore is not an 
alternative that the Park Service had to consider.

 2. Supplemental EIS

 An agency is required to prepare a supplemental EIS if 
"[t]here are significant new circumstances or information 

relevant to environmental concerns and bearing on the pro-
posed action or its impacts." 40 C.F.R. s 1502.09. "[N]ot 
every change requires [a supplemental EIS]; only those 
changes that cause effects which are significantly different 
from those already studied require supplementary consider-
ation." Corridor H Alternatives, Inc. v. Slater, 982 F.Supp. 
24, 30 (D.D.C.1997). The decision to prepare a supplemental 
EIS is again governed by the "rule of reason" and reviewed 
by the courts under the "arbitrary or capricious" standard of 
the APA. Marsh v. Oregon Natural Resources Council, 490 
U.S. 360, 373-75, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) 
("[A]n agency need not supplement an EIS every time new 
information comes to light after the EIS is finalized. To 
require otherwise would render agency decisionmaking in-
tractable"). Because the decision whether to prepare a sup-
plemental EIS involves technical issues within the agency's 
area of expertise, courts generally "defer to the 'informed 
discretion of the responsible federal agencies.' " Id. at 377 
(quoting Kleppe v. Sierra Club, 427 U.S. 390, 412, 96 S.Ct. 
2718, 49 L.Ed.2d 576 (1976)).

 Plaintiffs argue that the draft management plan, issued 
after the preparation of the final EIS, contains new proposals 
for managing Gettysburg's historic resources that will have a 
significant impact on the deer population, thus requiring the 
Park Service to prepare a supplemental EIS. Under the 
preferred alternative of the draft management plan, non-
historic woodlands will be cut, other woodlands will be 
thinned to take on the appearance of historic woodlots and 
new field patterns may reduce the availability of crops to the 
deer. See Draft GMP at 122-28. Plaintiffs argue that these 
steps will lead to a reduction in the deer population. Once 
again, plaintiffs have improperly focused the inquiry. The 
deer management program is intended to maintain the deer 
population density, not the total deer population. To consti-
tute "significant new circumstances or information" requiring 
a supplemental EIS, the draft management plan would have 
to have a significant effect on the deer population density 
needed to sustain the historic properties of the parks.

 Plaintiffs have failed to demonstrate that the draft manage-
ment plan would have any impact on the desired deer popula-
tion density.6 After years of study, the Park Service has 
determined that a deer population density of 25 deer per 
forested square mile is the appropriate level necessary to 
conserve the historic resources of Gettysburg and Eisenhow-
er. The target density is intended to ensure that there are 
adequate seedlings to regenerate the young oak and white 
ash trees that make up the historic woodlots and to ensure 
adequate crop production to "tell the stories" of the parks. 
See, e.g., Final EIS at 9,12, A.R. at 2206, 2209. The proposals 
in the draft management plan to cut non-historic woodlands, 
convert other woodlands into historic woodlots and change 
agricultural field patterns do not "cause effects which are 
significantly different from those already studied." Corridor 
H Alternatives, Inc. v. Slater, 982 F.Supp. at 30. Specifically, 
the Park Service found that the historic resources will not be 
changed under the draft management plan in a manner that 
alters the need to control overbrowsing through the mainte-
nance of the desired deer population density. Because the 
Court has no reason to question the exercise of discretion by 
the Park Service in its area of expertise, it concludes that the 
decision not to prepare a supplemental EIS was not arbitrary 
and capricious.7

__________
 6. Plaintiffs also contend that the changes in the draft manage-
ment plan might eliminate the need for any shooting because the 
deer will be driven outside the parks in search of cover and food. 
This contention, however, does not undermine the justification for 
the deer management program. If the deer migrate out of the 
parks as the plaintiffs contend they will, the Park Service will not 
shoot the deer, or will shoot fewer deer, because the deer popula-
tion density will fall to an acceptable level. See also ROD at 5, A.R. 
at 3574 ("When the population is reduced to the density goal, fewer 
deer will need to be killed annually to maintain the population at 
that level").

 7. Plaintiffs also argue that the Court should disregard the 
arguments the Park Service made for the first time in this Court as 
post hoc rationalizations that cannot support its decision. See 
Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Auto. 

 C. The National Historic Preservation Act

 Under Section 106 of the National Historic Preservation 
Act, the Park Service "shall ... take into account" the effects 
of any undertaking on a "site ... included in or eligible for 
the National Register." 16 U.S.C. s 470f. In assessing the 
effects of its undertaking, the Park Service is required to 
"afford the Advisory Council on Historic Preservation ... a 
reasonable opportunity to comment with regard to such un-
dertaking." 16 U.S.C. s 470f. If the effects are "adverse," 
the agency is required to consider means for alleviating the 
impacts after consulting the State Historic Preservation Offi-
cer ("SHPO"), the Advisory Council on Historic Preservation 
("ACHP") and the public. 36 C.F.R. s 800.5. "Adverse 
effects" are defined as any "effect on a historic property 
[that] may diminish the integrity of the property's location, 
design, setting, materials, workmanship, feeling, or associa-
tion" and expressly include the "[i]ntroduction of visual, audi-
ble, or atmospheric elements that are out of character with 
the property or alter its setting." 36 C.F.R. s 800.9(b). The 
requirements of Section 106, however, do not require the 
Park Service to engage in any particular preservation activi-
ties; rather, Section 106 only requires that the Park Service 
consult the SHPO and the ACHP and consider the impacts of 
its undertaking. See Nat'l Trust for Historic Preservation v. 
Blanck, 938 F.Supp. 908, 918 (D.D.C.1996) ("Section 106 is 
universally interpreted as requiring agencies to consult and 
consider and not to engage in any particular preservation 
activities per se").

__________

Ins. Co., 463 U.S. at 50. It appears from the record, however, that 
the Park Service never made the arguments before because plain-
tiffs never requested a supplemental EIS or argued that one was 
required until they raised the issue in this Court. Because the 
decision whether a supplemental EIS is required should be made 
initially by the agency, not by a reviewing court, plaintiffs should 
have made a request to the Park Service and allowed it to make a 
decision. Friends of the River v. FERC, 720 F.2d 93, 109 (D.C.Cir.
1983). Nevertheless, the Court need not consider the effect of 
plaintiffs' failure to raise the issue earlier because it rejects the 
request on its merits. Id.

 Plaintiffs do not argue that the Park Service failed to 
comply with the procedural requirements of Section 106. 
Instead, they assert that the Park Service in its review 
process ignored the primary argument presented by plain-
tiffs. Specifically, during the review process, plaintiffs main-
tained that the deer management program's effect on Get-
tysburg's "quiet contemplative atmosphere" was an adverse 
effect under the regulations of the Advisory Council on His-
toric Preservation. Plaintiffs based this argument on an ex-
cerpt from the National Register for Historic Places Bulletin 
on historic battlefields which described battlefields as "places 
of quiet contemplation." National Register for Historic 
Places Bulletin No. 40, Guidelines for Identifying, Evaluat-
ing, and Registering America's Historic Battlefields ("Bulle-
tin No. 40"), Plaintiffs' Exhibit G at 3. Because the SHPO, 
the ACHP and the Keeper of the National Register did not 
address or even mention Bulletin No. 40 in reviewing the 
deer management program, plaintiffs maintain that the find-
ing of no "adverse effect" is unlawful under the APA be-
cause a "relevant factor" was not considered. See Motor 
Vehicle Manufacturers Ass'n v. State Farm Mutual, 463 
U.S. at 43.8

 A review of the record, however, demonstrates that plain-
tiffs' arguments were considered. While it did not specifically 
refer to plaintiffs' argument or to Bulletin No. 40, the Park 
Service found in its original determination that there was no 
adverse effect on the setting, feeling or association of Gettys-
burg or Eisenhower from the proposed deer management 
program. See Letter from John A. Latschar, Superintendent 
of Gettysburg National Military Park to Brenda Barrett, A.R. 
at 6317-19 ("Audible effects are temporary, limited, propor-
tionally decreasing, and minimized by muzzle suppressors"). 
An evaluation of the setting, feeling or association of the 
parks necessarily would include an evaluation of the deer 

__________
 8. On this issue, the parties are like ships passing in the night. 
Nowhere in the arguments made by defendants before this Court 
do they even address Bulletin No. 40.

management program's effect on Gettysburg's "quiet con-
templative atmosphere."

 When the SHPO and the ACHP reviewed the determina-
tion of the Park Service, they received lengthy submissions 
from plaintiffs that fully discussed their argument and Bulle-
tin No. 40. See Letter from Katherine Meyer to Dr. Brent 
D. Glass and Brenda Barrett, A.R. at 6363-70; Letter from 
Katherine Meyer to John Fowler, Executive Director of 
Historic Preservation, A.R. at 6380-6435. Each of the re-
viewers approved the finding of no adverse effect. While the 
decisions do not mention Bulletin No. 40, the reviewers did 
discuss National Register Bulletin No. 38, addressing the 
contention that Gettysburg is a "traditional cultural proper-
ty." Viewed in context, this was merely a recharacterization 
of plaintiffs' argument rather than a neglect of it. See Letter 
from Donald Klima, Advisory Council on Historic Preserva-
tion to Carol Shull, Keeper of the National Register of 
Historic Places, A.R. at 6464-65 ("We note that the attributes 
cited [by plaintiffs' counsel] include values more often associ-
ated with traditional cultural properties, as opposed to other 
National Register properties, insofar as they depend, to a 
certain degree, upon the perceptions and beliefs of those who 
attribute sacred values to this property"); see also Letter 
from Carol D. Shull, Keeper of the National Register to 
Donald Klima, Advisory Council on Historic Preservation, 
A.R. 6506-07; Letter from Donald Klima, Advisory Council 
on Historic Preservation, to John A. Latschar, Superinten-
dent of Gettysburg National Military Park, A.R. 6504-05. 
This recharacterization, coupled with the reviewers' concur-
rence with the Park Service finding of no "adverse effect" on 
Gettysburg's setting, feeling or association, suggests that the 
SHPO and the ACHP fully considered plaintiffs' submissions, 
including the argument under Bulletin No. 40. The Court 
concludes that the Park Service complied with the APA by 
considering all relevant factors, including plaintiffs' argu-
ments, in its review of the effects of the deer management 
program under the NHPA.

 An Order consistent with this Opinion is entered this same 
day.

 SO ORDERED.